[Crim. No. 10453. First Dist., Div. Two. Mar. 31, 1972.]

In re AUBREY GROSSMAN on Habeas Corpus.

## COUNSEL

Rex H. Sater and Martin M. Spiegel for Petitioner.

Donald A. Jelinek as Amicus Curiae on behalf of Petitioner.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Gloria F. DeHart and Rodney J. Blonien, Deputy Attorneys General, for Respondent.

## OPINION

**ROUSE, J.**—Petitioner, an attorney, seeks annulment of an order of direct contempt issued by the Municipal Court of Sonoma County at the conclusion of a criminal trial of a number of defendants, some of whom were represented by petitioner. The order adjudged petitioner in contempt and imposed a fine of $500 and a sentence of imprisonment for five days.

We summarily denied petitioner's application for a writ of habeas corpus on January 3, 1972. On January 24, 1972, while a new petition was pending in the California Supreme Court, the United States Supreme Court decided *In re Little,* a per curiam opinion reported in 404 U.S. 553 [30 L.Ed.2d 708, 92 S.Ct. 659]. The *Little* case, along with *In re Hallinan* (1969) 71 Cal.2d 1179, 1182, 1183 [81 Cal.Rptr. 1, 459 P.2d 255], was cited by the California Supreme Court in its order to show cause before our court why the relief prayed for should not be granted.

Mindful of a special responsibility which rests heavily upon our shoulders

when called upon to examine the conduct of representatives of the bench and bar, in a judicial proceeding, we believe that a preliminary discussion and review of some basic concepts is in order.

There are, we suggest, certain areas of the trial arena in which a reviewing court must tread most cautiously. One of these involves the utilization of the physical senses in seeing and hearing what one does or says in the courtroom. This becomes an even more sensitive area when dealing with a case of alleged contempt. The cold transcript imparts information of little value concerning the appearance, general conduct and demeanor of the alleged transgressor. In the United States Supreme Court case of *In re Little, supra,* 404 U.S. 553, Mr. Chief Justice Burger pointed out that the propriety of such a holding depends "in a very special way on the setting, and such elusive factors as the tone of voice, the facial expressions, and the physical gestures of the contemnor; these cannot be dealt with except on full ventilation of the facts. Those present often have a totally different impression of the events from what would appear even in a faithful transcript of the record."

The efficacy of a proper exercise of the contempt power is directly related to the timeliness of the order which adjudges the contemner. If the contempt proceeding is to be at all meaningful then it is imperative that inappropriate and offensive conduct be dealt with promptly at the time of the occurrence, so as to create, hopefully, a lasting impression of cause and effect.

On the other hand, it is equally important that the situation be dealt with in an atmosphere of calm and dispassion. Often the person most qualified to evaluate the severity of such conduct is a judge who is the subject of what may have been a personal and bitter attack. Thus is created the dilemma which has plagued reviewing courts for years. The United States Supreme Court recognized the problem in the case of *Sacher* v. *United States* (1951) 343 U.S. 1 [96 L.Ed. 717, 72 S.Ct. 451]: "If we were to hold that summary punishment can be imposed only instantly upon the event, it would be an incentive to pronounce, while smarting under the irritation of the contemptuous act, what should be a well-considered judgment. We think it less likely that unfair condemnation of counsel will occur if the more deliberate course be permitted." (P. 11 [96 L.Ed. at p. 724].)

It has been suggested that a judge contemplating a summary contempt order might do well to declare a recess and, in the serenity of his chambers, reflect whether the conduct in question is truly so aggravated as to constitute contempt or whether his reaction to it is simply one of judicial nerves on edge. Rule F.3, subdivision (b), of the American Bar Association's re-

cently adopted Standards Relating to The Judge's Role in Dealing with Trial Disruptions (A. B. A. Project on Standards for Criminal Justice, Tentative Draft (May 1971)),[1] recommends that "The trial judge . . . consider the advisability of deferring adjudication of contempt for courtroom misconduct of a defendant, an attorney or a witness until after the trial, and . . . defer such a proceeding unless prompt punishment is imperative." (P. 19.)

Even more difficult in this field of direct contempt is the situation which confronts a judge when the conduct involves a lawyer's behavior in the course of trial. A reading of many appellate decisions dealing with this delicate subject discloses the existence of a very fuzzy area between the proper zeal of aggressive and effective advocacy and improper contumacy amounting to aggravated misconduct. So zealously have reviewing courts sought to preserve the right of the trial advocate's independence in pursuing his cause on behalf of a client that some attorneys have mistakenly concluded that rudeness and discourtesy in the judicial proceeding are accepted methods to be employed by the successful practitioner. While recognizing that an attorney has the duty to protect the interests of his client, that he has the right to press legitimate argument and to protest an erroneous ruling, and that an attorney may assert that which he believes to be correct in a forthright manner, if he acted in the due course of a judicial proceeding, our Supreme Court went on to caution that "We do not mean to suggest . . . that it is impossible for an attorney to subject a judge to ridicule and insult by intonations and gestures accompanying words wholly innocuous, or that, in such event, the judge is powerless to protect the dignity of the court." (*Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784, 796 [192 P.2d 905]; *In re Hallinan, supra,* 71 Cal.2d at p. 1183.)

Members of the bar have the right to expect and demand courteous treatment by judges and court attaches; similarly, the court has the right to expect and demand that, in the course of judicial proceedings, advocates will conduct themselves in a courteous, professional manner.

Section 6068 of the Business and Professions Code, in setting forth the obligations of an attorney in this state, provides, in part, that "It is the duty of an attorney: . . . (b) To maintain the respect due to the courts of justice and judicial officers. . . . (f) To abstain from all offensive personality . . . ."

Subdivision 3 of section 1209, Code of Civil Procedure, describes the following as "contempts of the authority of the court: . . . 3. Misbehavior

---

[1]All subsequent references to this publication are designated "ABA Standards."

in office, or other wilful neglect or *violation of duty by an attorney, . . .*" (Italics ours.)

We note that rule D.1 of the ABA Standards provides, in part, that "The trial judge should require attorneys to respect their obligations as officers of the court" (p. 13), and that rule A.2 provides, in part, that "The trial judge has the obligation to use his judicial power to prevent distractions from and disruptions of the trial" (p. 5).

In passing, we conclude that incidents involving unprofessional conduct on the part of some advocates in recent criminal trials have not gone unnoticed by our Chief Justice, Warren Burger, who, during an address given at the 1971 American Bar Association Convention, remarked that "To discharge properly the heavy responsibilities placed on the contending advocates in criminal cases, it is essential that they should possess sound legal education, basic training and skills in advocacy and *substantial instruction in professional behavior, and that they be aware of penalties for departures from professional norms.* . . . Observance of proper standards aids rather than hinders the accused because it provides him with an advocate who is trusted by the other key participants and yet does not in the slightest impede courageous, zealous and skillful advocacy." (Chief Justice Warren Burger, July 16, 1971, 94th Annual Meeting, A. B. A.; italics added.)

Summarizing the recitations in the order, it appears that petitioner was found in contempt for three instances of misconduct: (1) after having been admonished by the court to refrain, petitioner continued to argue after an objection by the prosecution had been sustained; (2) petitioner accused the court of favoring the prosecution in rulings on the admissibility of evidence; and (3) petitioner falsely accused the court of calling him (petitioner) a liar. The order recites that statements on which the second and third instances of misconduct were based were made in a "loud, disorderly, contemptuous, insolent and rude manner and tone of voice. . . ."

Language used by the trial court in its order follows that of Code of Civil Procedure, section 1209, which reads as follows: "The following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: 1. Disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to interrupt the due course of a trial or other judicial proceeding."

The conduct found contemptuous occurred in the immediate view and presence of the court during a jury trial in which petitioner was counsel for a number of defendants.

The power of the court to punish summarily for a direct contempt is con-

tained in Code of Civil Procedure, section 1211, which provides: "When a contempt is committed in the immediate view and presence of the court, . . . it may be punished summarily; for which an order must be made, *reciting the facts as occurring in such immediate view and presence,* adjudging that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed." (Italics added.)

"[A]ll that is required is that an order be made reciting the facts constituting the contempt, adjudging the person guilty, and prescribing the punishment." (*In re Karpf* (1970) 10 Cal.App.3d 355, 364 [88 Cal.Rptr. 895]; *In re Hallinan, supra,* 71 Cal.2d at p. 1180.)

The order, which recites facts pertinent to acts committed in the immediate view and presence of the court during the course of a trial, establishes the jurisdiction of the court to issue the order. Jurisdiction having been established, our responsibility on review of a contempt order "is merely to ascertain whether there was sufficient evidence before the trial court to sustain its judgment and order." (*Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 409 [42 Cal.Rptr. 441, 398 P.2d 777].) The power to weigh the evidence rests with the trial court. (*Bridges* v. *Superior Court* (1939) 14 Cal.2d 464, 485 [94 P.2d 983] (revd. on other grounds, *Bridges* v. *California* (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346]).)

■ *Was the trial judge so "personally embroiled" with petitioner as to make the judge unfit to sit in judgment on the contempt charge?*

■ Although Code of Civil Procedure, section 1211, permits summary punishment for direct contempt, the term "summary" refers to the character of the contempt proceeding, not its timing, does not demand instant punishment, and the practice of deferring the contempt adjudication of an attorney and the imposition of punishment until the end of the trial has been uniformly approved. (*People* v. *Fusaro* (1971) 18 Cal.App.3d 877, 888-889 [96 Cal.Rptr. 368];[2] *Sacher* v. *United States, supra,* 343 U.S. at pp. 9-10 [96 L.Ed. at pp. 723-724]; *Mayberry* v. *Pennsylvania* (1971) 400 U.S. 455 [27 L.Ed.2d 532, 91 S.Ct. 499];[3] rule F.3, subd. (b), ABA Standards, *supra,* p. 19.)

---

[2] In *People* v. *Fusaro, supra,* which the court noted was the first reported instance where a California judge saw fit to imprison an accused person's defense lawyer in midtrial (p. 888), the court concluded that "Unless demanded by overwhelming circumstances, the court-imposed delay caused by jailing the defense lawyer in midtrial is inherently wrong, damaging to the defendant's right to a speedy trial and antithetical to the public interest in speedy, economical justice." (P. 890.)

[3] In *Groppi* v. *Leslie* (1972) 404 U.S. 496 [30 L.Ed.2d 632, 92 S.Ct. 582], however, the court reversed a contempt order issued by a *legislative body* two days after the event, in the absence of the contemner, a layman, and without notice to him.

■ However, in *Mayberry* v. *Pennsylvania, supra,* the principle emerged that a judge may become so "personally embroiled" with a lawyer in the trial as to make him unfit to sit in judgment on the contempt charge. (P. 465 [27 L.Ed.2d at p. 540].) Rule F.5 of the ABA Standards suggests that "The judge before whom courtroom misconduct occurs may impose appropriate sanctions, including punishment for contempt, but should refer the matter to another judge if his conduct was so integrated with the contempt that he contributed to it or was otherwise involved, or his objectivity can reasonably be questioned." (P. 21.)

In the instant case, although petitioner was held in contempt on November 19, 1971, the order adjudging petitioner in contempt and imposing his sentence was not issued until November 23, 1971, after the jury had returned its verdict and had been excused.

Petitioner contends that the judge in the instant case was "personally embroiled," within the meaning of the *Mayberry* case, and that he was therefore entitled to have his contempt hearing before a different judge. A similar contention was made in *Weiss* v. *Burr* (D.Ariz. 1971) 327 F.Supp. 1306, 1309, where the court disposed of the argument as follows: "Petitioner relies on *Mayberry* to support his contention that due process was violated in that he was denied an unbiased judge. His reliance is misplaced. *Mayberry* holds that a judge who has been addressed with 'fighting words' such as 'dirty tyrannical old dog' and 'dirty sonofabitch' should not give himself the opportunity to give vent to personal spleen in a judgment of contempt at the end of a trial. *Mayberry* distinguished the kind of case at issue here: 'It is of course not every attack on a judge that disqualifies him from sitting. Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921,[4] we ruled that a lawyer's challenge, though "disruptive, recalcitrant, and disagreeable commentary," was still not "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." ' 91 S.Ct. at page 505."

We observe that the judge in *Ungar* v. *Sarafite, supra,* 376 U.S. 575, was much more "personally embroiled" with the offending attorney (see colloquy on p. 585, fn. 7 [11 L.Ed.2d at p. 929]). Also, the words used by petitioner in the instant case were not "fighting words" of the character employed in *Mayberry*. We conclude that the judge was not unfit to sit in

---

[4]The words used by the lawyer in the *Ungar* case, while he was on the witness stand, were as follows: "I am absolutely unfit to testify because of your Honor's attitude and conduct towards me. I am being coerced and intimidated and badgered. The Court is suppressing the evidence." (*Ungar* v. *Sarafite* (1964) 376 U.S. 575, 580, see also p. 584 [11 L.Ed.2d 921, 926, 928, 84 S.Ct. 841].)

judgment on the contempt charge and petitioner was not entitled to a hearing before another judge. (*Ungar* v. *Sarafite, supra,* p. 584 [11 L.Ed.2d at p. 928]; *Mayberry* v. *Pennsylvania, supra,* 400 U.S. at pp. 465-466 [27 L.Ed.2d at pp. 540-541]; *Weiss* v. *Burr, supra,* 327 F.Supp. at p. 1309.)[5]

■ *Is the order adjudging petitioner in contempt void in that it does not sufficiently recite the facts constituting contempt as required by Code of Civil Procedure, section 1211?*

Petitioner argues that the order, as worded, does not meet the test set forth in *In re Hallinan, supra,* 71 Cal.2d 1179, that "An order adjudging a person in direct contempt of court must recite *in detail* the facts constituting the alleged transgression *rather than the bare conclusions of the trial judge.*" (Italics added.)

The wording upon which petitioner relies appears in *In re Hallinan, supra,* at p. 1182. It is, however, a quote from the earlier *Gallagher* v. *Municipal Court* opinion (*supra,* 31 Cal.2d at p. 795). Code of Civil Procedure, section 1211, does not contain the words "in detail," and our conclusion is that although it may be better practice for the trial court to set forth the exact words used, we do not believe it is mandatory that that court do so. The order, as worded, states the facts "with sufficient particularity to show, without the aid of speculation, that a contempt actually occurred." (*Chula* v. *Superior Court* (1962) 57 Cal.2d 199, 203 [18 Cal.Rptr. 507, 368 P.2d 107, 97 A.L.R.2d 421].)

■ "Contempt committed in the immediate view and presence of the court, known as direct contempt, may be treated summarily. All that is required is that an order be made *reciting the facts,* adjudging the person guilty, and prescribing the punishment." (*In re Hallinan, supra,* 71 Cal.2d at p. 1180; italics added.)

We shall hereafter examine the record with respect to each instance of conduct found to be contemptuous to see if the evidence supports the finding of contempt in light of the cases cited to us by the California Supreme Court.

---

[5]In *In re Little, supra,* 404 U.S. 553, following the contempt adjudication, the defendant called the judge a "M—— F——." Mr. Chief Justice Burger and Mr. Justice Rehnquist, in a concurring opinion, suggested that Little be summoned before the court and *"observing the strictures of Mayberry . . ."* show cause why he should not be held in contempt for the conduct and utterances *following* the contempt adjudication (italics added). We know, at least, that the use of these words will constitute a contempt and also entitle the contemner to a hearing before another judge.

*Does the evidence show that a contempt was committed as to:*

(a) *The first instance of conduct found to be contemptuous?*

■ The first instance of conduct found to be contemptuous arose out of an exchange that took place on redirect examination, when the prosecutor objected to a question put to a witness by the petitioner. The order adjudging petitioner in contempt sets forth these preliminary facts and then recites the first instance of conduct found to be contemptuous as follows: "After having been repeatedly instructed and admonished by the Court to refrain from such activity and comment, [petitioner] continued to argue after the above-mentioned ruling of the Court [that the objection was sustained] had been made and announced."

We have examined the record and find that no ruling on the objection was ever made.[6] Thus, the evidence does not support the finding that petitioner "continued to argue after the above-mentioned ruling . . . had been made and announced." In addition, the record shows that after petitioner had been admonished, he asked permission to reply to the stated objection.

■ "An attorney has the duty to protect the interests of his client. He has a right to press legitimate argument and to protest an erroneous ruling.[7] . . . [A]n attorney may assert that which he believes to be correct in a forthright manner, if he is acting in the due course of a judicial proceeding. [Citation.]" (*Gallagher* v. *Municipal Court, supra,* 31 Cal.2d at p. 796; *In re Hallinan, supra,* 71 Cal.2d at p. 1183.)

■ We conclude that the evidence does not support the order with respect to the first instance of conduct found to be contemptuous.

(b) *The second instance of conduct found to be contemptuous?*

■ The second instance of conduct found to be contemptuous is stated in the order as follows: "In a loud, disorderly, contemptuous, insolent and rude manner and tone of voice, and in the presence of the jury, accused the Court of exercising different standards of judgment in favor of the prose-

---

[6]The Attorney General concedes that "the record does not disclose that a ruling was ever made on his objection . . . ." He then goes on to say that "petitioner so upset the judicial process, that [the judge] did not rule on the objection in question."

[7]Evidence Code, section 774, provides: "A witness once examined cannot be re-examined as to the same matter without leave of the court, *but he may be re-examined as to any new matter upon which he has been examined by another party to the action.* Leave may be granted or withheld in the court's discretion." (Italics added.) Although no ruling on the objection was made, we do know that the court *intended* to sustain the objection, for the order adjudging petitioner in contempt stated that the court did *in fact* sustain the objection.

cution and against the defense in determining the admissibility of proffered evidence."

The offending words were: "unless there's a different rule for him than for me."[8]

In *In re Little, supra,* 404 U.S. 553, cited to us by the California Supreme Court in the order to show cause, a defendant arguing his own case made statements in summation that the court was biased and prejudged the case and that he was a political prisoner. The North Carolina court, on the basis of a statute similar to our Code of Civil Procedure, section 1209,[9] adjudged him in contempt for these statements, wording its order as follows: " 'The Court concludes on the foregoing facts that the conduct of the [petitioner] and the words spoken by him in the presence of the Court were contemptuous, that they reflected on the integrity of the Court and tended to subvert and prevent justice.' "

The United States Supreme Court reversed the judgment. Its holding was as follows: "We hold that in the context of this case petitioner's statements in summation did not constitute criminal contempt. The court's denial of the continuance forced petitioner to argue his own cause. He was therefore clearly entitled to as much latitude in conducting his defense as we have held is enjoyed by counsel vigorously espousing a client's cause. *In re Mc-*

---

[8]"MR. GROSSMAN: The question that he asked was, 'So you go around the country occupying.' All right. Doesn't he open the question of whether he does go around the country occupying? So I want to ask him about a place that he did occupy. THE COURT: What has that to do with the issues in this case? MR. GROSSMAN Well, then, why did he ask it? I've said it before: If he's willing to open up an irrelevant field, then I'm entitled to redirect or on cross to go into the same field, unless there's a different rule for him than for me. THE COURT: Mr. Grossman, you know better than that. MR. GROSSMAN: I don't know better than that. So don't say I know better than that. THE COURT: Mr. Grossman—MR. GROSSMAN: I say what I believe. Don't say I know better than that. You're saying I'm a liar. I'm not a liar, Judge. Don't say I know better than that. THE COURT: I cite that as misconduct, Mr. Grossman. MR. GROSSMAN: What? That I said you call me a liar? THE COURT: Is misconduct. Your whole line of conduct, Mr. Grossman. I think at this time it might be a good place to take our afternoon recess. I think counsel and the Court will have some conversation to engage in which should more properly be done outside the presence of the ladies and gentlemen of the jury. Now, we'll take our recess at this time until 10:00 o'clock on Monday morning. Once again, while we're disbanded, once again let me remind you of my admonition about discussing the case or forming or expressing any opinions. I expect counsel to remain."

[9]The statute involved in the *Little* case differed from ours in this respect: The wording of our Code of Civil Procedure, section 1209, is *"tending* to interrupt the due course of a trial," (italics added), whereas section 5-1(1) of the North Carolina statutes, makes punishable for contempt " 'Disorderly, contemptuous, or insolent behavior committed during the sitting of any court of justice, in immediate view and presence of the court, and *directly tending to interrupt its proceedings,* or to impair the respect due to its authority.' " (*In re Little, supra;* italics added.)

*Connell,* 370 U.S. 230 (1962). *There is no indication, and the State does not argue, that petitioner's statements were uttered in a boisterous tone or in any wise actually disrupted the court proceeding.* Therefore, 'The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil . . . . [T]he law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate.' *Craig* v. *Harney,* 331 U.S. 367, 376 (1947). 'Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.' *Brown* v. *United States,* 356 U.S. 148, 153 (1958).

"The reversal of this conviction is necessarily required under our holding in *Holt* v. *Virginia,* 381 U.S. 131 (1965). There attorneys filed motions that the trial court recuse himself and for a change of venue, alleging that the judge was biased. The motion for change of venue alleged that the judge intimidated and harassed the attorneys' client. The court adjudged the attorneys in contempt for filing these motions. We reversed for reasons also applicable here:

" 'It is not charged that petitioners here disobeyed any valid court order, *talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties.* Their convictions rests on nothing whatever except allegations made in motions for change of venue and disqualification of Judge Holliday because of alleged bias on his part.' *Id.,* at page 136." (*In re Little, supra,* 404 U.S. 553, 555-556 [30 L.Ed.2d 708, 710-711]; italics added.)

Because of the obvious significance of the *Little* opinion, we have also examined the cases cited in *Little* upon which the court relied in arriving at its conclusion:

(1) *In re McConnell* (1962) 370 U.S. 230, 236 [8 L.Ed.2d 434, 438, 82 S.Ct. 1288]. The court held that "The arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer *does not in some way create an obstruction which blocks the judge in the performance of his judicial duty.*"[10] (Italics added.)

---

[10] 18 United States Code Annotated section 401, the statute under which McConnell was convicted, provides that the court shall have power to punish such contempt of its authority as "Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; . . ."

(2) In *Holt* v. *Virginia* (1965) 381 U.S. 131 [14 L.Ed.2d 290, 85 S.Ct. 1375], the principal case upon which the *Little* court relied, attorney Dawley, when ordered to show cause why he should not be held in contempt for refusing to answer questions, filed a motion to disqualify the judge, which was denied. He then filed a motion for change of venue, and attorney Holt, representing him on the motion, *read* to the court the motion as part of his argument urging a change of venue. The motion charged the court with "in effect and/or in fact acting as police officer, chief prosecution witness, adverse witness for the defense, grand jury, chief prosecutor and judge." (P. 133 [14 L.Ed.2d at p. 292].) The Virginia Supreme Court of Appeals affirmed a judgment of contempt against both lawyers, holding that the language used in the motion violated Virginia Code Annotated, section 18.1-292 (1960 Repl. Vol.), which authorizes summary punishment of a person who misbehaves in the presence of the court so as to obstruct justice, or who uses " '[v]ile, contemptuous or insulting language' " to or about a judge in respect of his official acts (p. 135 [14 L.Ed.2d at p. 293]). The United States Supreme Court reversed, stating that "neither Dawley nor his counsel could consistently with due process be convicted for contempt for filing these motions unless it might be thought that there is something about the language used which would justify the conviction.

"As previously stated, *the words used in the motions were plain English, in no way offensive in themselves, and wholly appropriate to charge . . . bias of the presiding judge.*" (*Holt* v. *Virginia, supra,* pp. 136-137 [14 L. Ed.2d at p. 294]; italics added.)

Thus, under the *Little* case, a charge of bias (which we have here) made in plain English ("unless there's a different rule for him than for me") cannot be the basis of a contempt charge unless it (a) was uttered in a loud and boisterous tone, or (b) actually disrupted the court proceedings. (*In re Little, supra,* 404 U.S. 553.)

The order states that "said act and words were grossly contemptuous of the orderly process and dignity of the Court, and tended to and did, interrupt the due course of the trial."[11] It is apparent from the record in this case that petitioner did not heed the court's admonition but chose instead

---

[11]In *Little,* the United States Supreme Court noted that the district court's conclusion that the statements " 'reflected on the integrity of the Court and tended to subvert and prevent justice' " amounted to a finding by the district court that the words were wilful and intentionally used and that the words used " *'tended to interrupt the Court's proceedings* and to impair the respect due its authority.' " It then noted that the state did not argue and there was no indication that the statements "in any wise *actually disrupted the court proceeding.*" (Italics added.)

to persist in a course of conduct which did disrupt the judicial proceedings to the extent that the judge found it necessary to recess the trial and hold a further hearing with petitioner concerning his conduct. Immediately after the occurrence of the third instance of conduct found to be contemptuous, the trial was recessed for the day at 3:50 p.m. and counsel were directed to remain, at which time the judge and petitioner had further discussion regarding the conduct in question. It was after this discussion that the judge announced his decision to hold petitioner in contempt and to take the matter up at the conclusion of the trial. Certainly, the argument of the Attorney General that the court's action in recessing the proceedings at that time was proof of an interruption of the court proceedings and his observation that petitioner so upset the judicial process that the judge failed to rule upon the objection in question is most persuasive on this point.

The order *does* recite that the statement constituting the second instance of conduct found to be contemptuous was made in a "loud, disorderly, contemptuous, insolent and rude manner and tone of voice," meeting the first requirement of *Little.* California law requires a warning in instances of contempt based on tone of voice or manner.[12] The record here shows that the court had warned petitioner about continuing to interrupt *"in such a fashion"* when an objection was being stated.[13] (Italics added.) Although the text of that admonition does not make precise reference to a "loud" or "boisterous" tone of voice, it certainly refers to counsel's disorderly *manner.*

We conclude that the trial court's order adjudging petitioner in contempt as to the second instance complies with the requirements of *Little* and *Hallinan,* and accordingly must be upheld.

(c) *The third instance of conduct found to be contemptuous?*

The third instance of conduct found to be contemptuous is stated in the order as follows: "In a loud, disorderly, contemptuous, insolent and rude manner and tone of voice, and in the presence of the jury, falsely accused the Court of calling him a liar."

The record shows the offending words to be: "THE COURT: Mr. Grossman, you know better than that. MR. GROSSMAN: I don't know better than

---

[12]*In re Hallinan, supra,* 71 Cal.2d at page 1185; *Gallagher* v. *Municipal Court, supra,* 31 Cal.2d at pages 796-797.

[13]"THE COURT: Not when an *objection is being stated,* Mr. Grossman. You know better than that. *If you continue to interrupt in such a fashion,* not only will your record be so fouled up that it will never be undone, but I will take more firm steps to see that it doesn't recur. I think I make myself clear, do I not? MR. GROSSMAN: I suppose so." (Italics added.)

Note: Webster defines "fashion" as being synonymous with the word "manner." (Webster's New Collegiate Dict. (7th ed. 1971).)

that. So don't say I know better than that. THE COURT: Mr. Grossman— MR. GROSSMAN: I say what I believe. Don't say I know better than that. *You're saying I'm a liar.* I'm not a liar, Judge. Don't say I know better than that." (Italics added.)

█ A judge of a court is well within his rights in protecting his own reputation from groundless attacks upon his judicial integrity. (*In re Friday* (1934) 138 Cal.App. 660, 663 [32 P.2d 1117].) "That counsel may have proceeded out of an excess of zeal . . . does not justify making scandalous charges against the judge." (Mosk, J., *Direct Contempt* (1956) 31 State Bar J. 510, 517.)

█ It is noted that the court in the instant case did not rest the third instance of misconduct on the false accusation alone. The order states that the false accusation was made "In a loud, disorderly, contemptuous, insolent and rude manner and tone of voice . . . ."

Our interpretation of *Hallinan* is that a warning is required "When the contempt order is based on statements of an attorney made in open court *the language of which is in itself not insolent, contemptuous or disorderly.* . . ." (*In re Hallinan, supra,* 71 Cal.2d at p. 1181; italics added.) We must then determine whether the language used in the instant case meets that test.

We conclude that the record *does not* support the accusation made against the judge in this instance and that such accusation was rude and insolent; further, that the language, when considered in context with the balance of counsel's statement,[14] was on its face contemptuous and thus no warning was required.

The record here discloses that the attorney who was the subject of this order has been in practice for 35 years. We can readily distinguish a situation which involves a trial practitioner with that amount of experience from that of a lay person appearing in propria persona or one who has had little experience as a lawyer. Surely, counsel well knew that there were many ways with which to deal with a troublesome ruling other than by a personal assault upon the judge. Certainly the rebuking and untruthful accusation that "You're saying I'm a liar" could only have the effect of demeaning the entire judicial process in the eyes of the jurors and others there present.

The order is annulled with respect to the first instance, and affirmed as to the second and third instances, of conduct found to be contemptuous.

---

[14]"MR. GROSSMAN: I say what I believe. Don't say I know better than that. *You're saying I'm a liar.* I'm not a liar, Judge. Don't say I know better than that." (Italics added.)

The matter is remanded to the municipal court for reconsideration of the punishment in light of this decision.

Taylor, P. J., concurred.

**KANE, J.**—I concur with that portion of the majority opinion which sustains the charges in paragraphs 2 and 3 of the order of contempt. I respectfully disagree, however, with the conclusion of my distinguished brethren that the charges in paragraph 1 have not been sustained.

It seems to me that some fundamental principles must be recognized at the very outset of the consideration of this case. First of all, we are dealing with the conduct of an attorney vis-à-vis the conduct of a trial judge during the course of a trial *in the presence of a jury composed of laymen*. On its face this is a setting which should never be subjected to the trauma that inevitably flows from a verbal conflict between counsel and court. That such should not occur is particularly true in California, where more than ample means and procedures are provided to parties and attorneys to avoid embarking on any potential collision course with a particular judge. For example, a trial judge may be disqualified peremptorily (Code Civ. Proc., § 170.6) or upon a showing of prejudice (Code Civ. Proc., § 170).

Once the trial begins, however, every lawyer should be conclusively presumed to know that it is totally improper for him to argue with a judge or to dispute a judge's ruling *in front of the jury*.

Once again, very simple avenues are made available to trial counsel to accomplish the *bona fide* pursuit of any disagreement with the trial judge and/or his rulings. For example, counsel can request an immediate recess or wait for the next normal recess and have the matter heard out of the presence of the jury.

This, of course, assumes that the potential or actual collision course comes about by reason of good faith advocacy by counsel who is seeking to fully protect his client's best interests.

However, as Mr. Justice Rouse correctly points out, a "very fuzzy area" between proper advocacy and contempt has been created by appellate decisions which have led some attorneys to conclude "that rudeness and discourtesy in the judicial proceeding are accepted methods to be employed by the successful practitioner." In my view there simply is no room for the existence of any "fuzzy area" when dealing with this fundamentally simple problem.

With the readily available avenues suggested above I cannot find any

justification for any lawyer—let alone a lawyer such as petitioner who possesses 35 years' experience—precipitating a dialogue with the court in the presence of the jury which is contemptuous, either in content or demeanor or both. The sole and exclusive responsibility for this must rest upon the lawyer for it is he, and only he, who possesses the power to prevent its occurrence.

Certainly any judge who has sat on the trial court appreciates the awesome potential of the contempt power. It is a matter of common judicial knowledge that this power is exercised very rarely indeed with respect to conduct of lawyers. Any competent judge—and the record here discloses obvious competency on the part of the trial judge—is keenly aware of and able to distinguish between zeal of advocacy and disrespect, i.e., contempt of court. If a judge is unable, or refuses, to make that distinction there are remedies available running all the way from peremptory challenge and appellate reversal to disciplinary action through the Commission on Judicial Qualifications.

The plain fact of the matter is embodied in the age-old American concept that this is, and must remain, a government of laws and not men. The judge is simply the entity placed by government in a position which carries great responsibility and is accordingly entitled to great respect by counsel who are licensed by that same government to practice their profession before the court.

As the majority opinion points out, the American Bar Association has promulgated a compendium of rules or guidelines with respect to conduct of trials. Other interested and distinguished groups have undertaken similar action (see Report and Recommendations On Disruption of The Judicial Process, American College of Trial Lawyers (July 1970)). Articles dealing with the same subject have reached voluminous proportions. All of this effort is academically healthy; but the problem is not nearly as complex as suggested by these observers. On the contrary, in my view, the problem is so fundamentally simple that it should be likened to the forest obscured by the trees.

The entire problem of direct contempt—verbal or conduct—by a lawyer is simply a matter of overtly refusing to accede *temporarily* to duly constituted authority. The case at bench presents a classic example.

I. *Contempt Incident No. 1.*

During redirect examination of a defendant the prosecutor objected and the following colloquy took place:

"MR. GROSSMAN: Q. You mentioned Toyon as a surplus government property. Did you actually participate and occupy in Toyon? A. This— MR. GALLAGHER: Your Honor, I'm objecting. I don't know as it's material for us to go through a litany of—MR. GROSSMAN: You want to know about his activities. You are perfectly willing to ask him whether his activities was going around occupying—just one moment, please. THE COURT: Just a moment, please, Mr. Grossman. Let Mr. Gallagher finish first. MR. GROSSMAN: I started first. So I'm entitled to finish. Isn't that the rule in this court? If I start, I'm entitled to finish. THE COURT:.Not when an objection is being stated, Mr. Grossman. You know better than that. If you continue to interrupt in such a fashion, not only will your record be so fouled up that it will never be undone, but I will take more firm steps to see that it doesn't recur. I think I make myself clear, do I not? MR. GROSSMAN: I suppose so. THE COURT: Now, state your objection. MR. GALLAGHER: I object to this as going into matters that are immaterial. My question that I asked earlier merely called for a 'yes' or 'no' matter, not a detailed report as to his activities in other regards. This courtroom is—I don't feel that the courtroom is the proper forum for Mr. Hernandez to state his beliefs in regards to what's happened to the Indians in the past. If Mr. Grossman would like him to be able to make a speech, he can find some other place to do it. MR. GROSSMAN: Very snide kind of legal objection. But now may I reply to it? THE COURT: You may. MR. GROSSMAN: The question that he asked was, 'So you go around the country occupying.' All right. Doesn't he open the question of whether he does go around the country occupying? So I want to ask him about a place that he did occupy. THE COURT: What has that to do with the issues in this case? MR. GROSSMAN:Well, then, why did he ask it? I've said it before: If he's willing to open up an irrelevant field, then I'm entitled to redirect or on cross to go into the same field, unless there's a different rule for him than for me. THE COURT: Mr. Grossman, you know better than that. MR. GROSSMAN: I don't know better than that. So don't say I know better than that. THE COURT: Mr. Grossman— MR. GROSSMAN: I say what I believe. Don't say I know better than that. You're saying I'm a liar. I'm not a liar, Judge. Don't say I know better than that. THE COURT: I cite that as misconduct, Mr. Grossman. MR. GROSSMAN: What? That I said you call me a liar? THE COURT: Is misconduct. Your whole line of conduct, Mr. Grossman. I think at this time it might be a good place to take our afternoon recess. I think counsel and the Court will have some conversation to engage in which should more properly be done outside the presence of the ladies and gentlemen of the jury. Now, we'll take our recess at this time until 10:00 o'clock on Monday morning. Once again, while we're disbanded, once again let me

remind you of my admonition about discussing the case or forming or expressing any opinions. I expect counsel to remain."

The order of contempt as to this incident reads: "After having been repeatedly instructed and admonished by the Court to refrain from such activity and comment, [petitioner] continued to argue after the above-mentioned ruling of the Court [that the objection was sustained] had been made and announced."

In holding that the evidence does not support the finding that petitioner "continued to argue after the above-mentioned ruling of the Court had been made and announced" the majority, I respectfully submit, takes an unnecessarily technical and microscopic position with respect to the fact that the court did not, in effect, say "Objection sustained."

Although a categorical ruling on the prosecutor's objection was not made by the court, the only rationally reasonable inference to be drawn from the colloquy is that the objection was, in fact, being sustained by the court. The record shows that both the judge *and petitioner* understood that the ruling had been made implicitly if not expressly.[1]

In sustaining the objection the court was clearly acting within its discretion in limiting or prohibiting the attempted line of inquiry. Evidence Code, section 774, which is quoted in the majority opinion, is a codification of the common law rule granting extremely broad discretion to the trial judge in allowing or restricting the scope of redirect examination. Thus, once the court made its position clear, which it did, counsel should have pressed his argument outside the jury's presence as suggested above.[2] Nothing in *In re*

---

[1]That the judge thought he had sustained the objection is demonstrated in the order of contempt itself, viz.: "after the abovementioned ruling of the Court had been made and announced."

Petitioner's clear understanding is demonstrated by his own statement made immediately following the episode after the court had excused the jury for the day: "[MR. GROSSMAN:] But what I was trying to do was to get you to change *your ruling on this point,* because *I felt the ruling on this point* proved conclusively this question of whether there is a discriminatory way. . . . Well, *your ruling started it; your ruling started it.* You can't forget how it started." (Italics added.)

[2]It is manifestly clear that petitioner knew that the proper way to pursue his argument was out of the jury's presence for the record, a portion of which is quoted in footnote 1, *ante,* shows that petitioner did press his argument forcefully. Many of petitioner's comments during this argument are themselves disrespectful and display an offensive personality per se. For example: "THE COURT: The record should note that the ladies and gentlemen of the jury have now cleared the courtroom.

"Mr. Grossman, I've cited you for misconduct and taken exception to your remarks and the charges, both implied and explicit, that the Court has different rules for the prosecution than the defense, and the accusation of judicial misconduct. Now, I would expect, first of all, an apology. Is one forthcoming? MR. GROSSMAN: Well, I would suggest you have the record read back. You did not cite me for misconduct

*Hallinan* (1969) 71 Cal.2d 1179 [81 Cal.Rptr. 1, 459 P.2d 255] suggests to me that the " 'right to press *legitimate* argument and to protest an erroneous ruling' " is an invitation to engage in an argument with the judge *before the jury*. On the contrary, the *Hallinan* court, at page 1183, approved its earlier statement in *Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784 [192 P.2d 905]: " 'We do not mean to suggest by anything said herein, that it is impossible for an attorney to subject a judge to ridicule and insult by intonations and gestures accompanying words wholly innocuous, or that, in such event, the judge is powerless to protect the dignity of the court.' "[3]

---

for that. You cited me for misconduct because I said that you were calling me a liar, and I'm no liar. And I suggest, before you engage in ruling on whether I've committed contempt, *you better be sure that the record, which you're going to have to depend on, says that.* Now, I say you cited me for misconduct for that. *And you've realized since then how off base you were,* because the remark you made to me, if I may finish, the remark you made to me was not that 'you ought to know better,' but 'you should know better.' *And I'm smart enough to know you're calling me a liar before the jury.* You're saying, 'You know better,' and I said to you, 'I don't know better and you don't call me a liar.' Now, I've got some rights. And you're prejudicing this jury against me. THE COURT: I take it that that is not the form of an apology. MR. GROSSMAN: *What do you want an apology for?* THE COURT: Well, then, I need—MR. GROSSMAN: *I say, what do you want an apology for, what statement?"* (Italics added.)

[3]Of coincidental interest is the earlier case of *Hallinan* v. *Superior Court* (1925) 74 Cal.App. 420 [240 P. 788], which deals with the precise question of the extent of the attorney's right to argue a matter before the court. In upholding an order of contempt against the attorney for continuing to protest the court's ruling on an objection, the court made the following observations which are as sound today as they were 46 years ago: *"This right to argue a matter before the court, however, is not unlimited.* It must be exercised under the direction of the court and within such limits as may be prescribed by the court in the exercise of its discretion to regulate such matters. Otherwise, an attorney might delay and impede the trial of a case far beyond any legitimate limits. Argument of counsel, upon questions arising during the progress of a trial, is addressed solely to the court and its object and purpose is to enable the court to have the benefit of the views of counsel upon the questions under discussion in order that the court may be better advised upon such questions before it is called upon to decide them. *The court, rather than the attorneys in the case, must be the judge as to the extent and scope of such argument.* This must necessarily be so for two reasons. In the first place, the court is primarily responsible for the prompt and orderly dispatch of business pending before it. *To permit attorneys in all cases to decide how often and how long they will argue questions arising during the trial, would mean that the direction and control of litigation would be taken from the court and transferred to counsel* in the case, and would often result in the unwarranted consumption of the time of the court to the great detriment not only of the parties to the pending litigation, but also of those whose actions are awaiting trial. In the second place, as the argument of counsel is directed to the court alone, the court is in far better position than counsel to decide when it is sufficiently informed as to the subject under consideration. When the court reaches the point that it feels that it is fully advised as to the question under discussion and ready to rule upon the same, and, therefore, requires no further enlightenment from counsel, *it is surely clothed with adequate power and authority to order the argument at an end, and,*

If this is a "fuzzy area," it should be eliminated so that the trial of contested cases, especially jury cases, can be conducted in an atmosphere of dignity and respect.[4] Here, the aggravated conduct of petitioner is amply demonstrated by his refusal to heed the judge's instructions and admonition.

## II. *Contempt Incident No. 2.*

In addition to the reasons advanced by the majority for upholding the order of contempt as to this incident, I believe further comment is appropriate.

The order of contempt as to this incident reads: "In a loud, disorderly, contemptuous, insolent and rude manner and tone of voice, and in the presence of the jury, accused the Court of exercising different standards of judgment in favor of the prosecution and against the defense in determining the admissibility of proffered evidence."

As pointed out in the majority opinion, the offending words of petitioner were "unless there's a different rule for him [the prosecutor] than for me." The majority opinion presents an excellent analysis of *In re Little* (1972) 404 U.S. 553 [30 L.Ed.2d 708, 92 S.Ct. 659], and its foundation cases. There are, however, two fundamental differences between the situation in *Little* and the case at bench. These differences, in my view, are of such significance that *In re Little* is, upon analysis, not germane to our inquiry.

*when necessary, in order to enforce its order, to punish the attorney guilty of its infraction. Under such circumstances, the action of counsel, in persisting in arguing a matter to the court, after the court has repeatedly ordered him to desist, amounts to disorderly behavior toward the judge of the court, which directly tends to interrupt the due course of the trial and is also disobedience of the lawful order of the court. Such acts are defined as contempt by the provisions of section 1209 of the Code of Civil Procedure."* (Pp. 425-426; italics added.)

[4]This is not a novel proposition at all. It was recognized and imprinted upon the law of this state in 1930 in the case of *In re Grossman*, 109 Cal.App. 625 [293 P. 683], where the court clearly points out that zeal of advocacy must yield to the dignity and authority of the court: " '*Attorneys at the bar are properly termed the "court's constituency", to aid it in the due administration of justice. Each one is required to take an oath that he will honestly and faithfully discharge his duties as such attorney, and one of the cardinal duties enjoined upon him by law is to maintain the respect that is due to the court of justice and judicial officers*. . . . In the determination of the question as to whether a contempt has been committed, it does not depend upon the intention of the offending party, but upon the act he has done. A disclaimer of intentional disrespect or design to embarrass the administration of justice is no excuse for the person charged with the offense, when the contrary appears, from a fair interpretation of the language used. . . . *It is the imperative duty of an attorney to respectfully yield to the rulings and decisions of the court, whether right or wrong, reserving the rights of his client by proper and necessary exceptions thereto. A remedy for the correction of the court's errors, if any, is fully provided by law*.' " (P. 631; italics added.)

The first significant difference is that *Little* does not involve attorney contempt. To one not trained in the law, application of rules concerning verbalized or conduct contempt should obviously be made with greater hesitancy and less frequency than in the case of an attorney.

The second difference of moment is that in *Little* the United States Supreme Court suggests that a charge of bias on the part of the judge made in plain English cannot constitute contempt unless *either* (a) it was uttered in a loud and boisterous tone *or* (b) actually disrupted the court proceedings. But the court in *Little* took pains to point out: "There is no indication, and the State does not argue, that petitioner's statements were uttered in a boisterous tone or in any wise actually disrupted the court proceeding." In the case at bench, however, the order clearly recites that petitioner did speak in a "loud, disorderly, contemptuous, insolent and rude manner and tone of voice . . . ." Additionally here, as distinguished from *Little,* there was interruption of the proceedings of the court. As pointed out in the portions of the transcript quoted above, the episode caused the court to recess the case for the purpose of accomplishing further dialogue with counsel out of the presence of the jury. It should also be observed in passing that the remarks cited as contemptuous in *Little* came during the closing argument of the defendant appearing in propria persona. Here the remarks came during the testimony of a witness and the proceedings were clearly interrupted thereby.

I must also disagree with the majority's narrow interpretation of *Little* that a charge of bias against a judge cannot be the basis of a contempt charge unless (a) it was uttered in a loud and boisterous tone, or (b) actually disrupted the court proceedings.

For this proposition, the court in *Little* relied on its earlier decision in *Holt* v. *Virginia* (1965) 381 U.S. 131 [14 L.Ed.2d 290, 85 S.Ct. 1375], a case presenting a totally different courtroom situation from that involved in either *Little* or the case at bench. *Holt* involved statements contained in a written motion for change of venue read by the litigant's attorney at a hearing on that motion. *No jury was present in Holt;* and the attorney was not engaged in a disrespectful dialogue with the court as here.

A word should also be said about the California requirement of a warning in instances of contempt based on tone of voice or manner. (*In re Hallinan, supra,* 71 Cal.2d 1179.)

The *Hallinan* rule of warning is limited to "statements of an attorney made in open court *the language of which is in itself not insolent, contemptuous or disorderly,* . . . ." (P. 1181; italics added).

Although the words involved in this incident are per se contemptuous and therefore required no warning, the rationale of requiring a warning from the court with respect to an attorney's statements is, in my opinion, unrealistic. Language which on its face does not seem to be insolent or contemptuous or disorderly may very well be all of those things in a given context or setting or in the reflection of a background of days, weeks or even months of trial wherein courtroom contact between attorney and judge is a constant environment.

The consternation of trial judges charged with the duty of maintaining order and dignity in the proceedings over which they preside in attempting to draw sophisticated and artificial lines between those incidents which require a precedent warning and those which do not should be understandable by anyone who has experienced this judicially declared dilemma. (See Goff, *In re Hallinan: Does It Really Shrink the Contempt Power?* (1971) 46 State Bar J. 155.)

A major reason for the warning rule " '*is the fundamental interest of the public in maintaining an independent bar.* Attorneys must be given a substantial freedom of expression in representing their clients.' " (*In re Hallinan, supra,* 71 Cal.2d at p. 1183; quoting *Gallagher* v. *Municipal Court, supra,* 31 Cal.2d 784; italics added.)

But I submit that there is a deeper fundamental interest of the public in maintaining orderly, dignified, court proceedings; and that inherent in this consideration is the necessary ingredient of expecting attorneys who are privileged to participate in the maintenance of this public trust to live up to their responsibilities without being warned or reminded of them in the fashion of a child. The image of lawyers—bench and bar—is today in such poor position in the public view because the legal profession, charged and entrusted with the resolution of many of society's greatest problems, fails to display the maturity required to attain a vitally essential goal—its own self-discipline.

It is time for all members of the legal profession to stand back and take a hard look at ourselves, the positions that we occupy with respect to each other, and most importantly, the fundamental purpose for which courts exist—to serve the public good.

III. *Each of the incidents of contempt comes within the purview of Code of Civil Procedure, section 1209, subdivision 3.*

Code of Civil Procedure, section 1209, provides in part: "The following acts or omissions in respect to a court of justice, or proceedings therein,

are contempts of the authority of the court: . . . 3. Misbehavior in office, or other wilful neglect *or violation of duty by an attorney,* counsel, clerk, sheriff, coroner, or other person, appointed or elected to perform a judicial or ministerial service;" (italics added).

Business and Professions Code, section 6068, provides in pertinent part: *"It is the duty of an attorney:* . . . (b) To maintain the respect due to the courts of justice and judicial officers. . . . (f) To abstain from all offensive personality . . . ." (Italics added.)

As to paragraph 1 of the order of contempt, petitioner's conduct in refusing to accede to the court's ruling, despite admonition from the court, shows an unequivocal failure to "maintain the respect due to the courts of justice and judicial officers" (Bus. & Prof. Code, § 6068, subd. (b)).

As to paragraph 2 of the order of contempt, petitioner's intimation that the court was biased in favor of the prosecution, which intimation was made "In a loud, disorderly, contemptuous, insolent and rude manner and tone of voice, and in the presence of the jury," clearly constitutes disrespect of the court and judge, a violation of Business and Professions Code, section 6068, subdivision (b), and patently reveals a display of "offensive personality;" a violation of Business and Professions Code, section 6068, subdivision (f).

As to paragraph 3 of the order of contempt, the majority correctly holds that it is beyond all doubt that petitioner's false assertion that the judge had called petitioner a liar is contemptuous per se. At the same time it is, per se, a failure to maintain respect (Bus. & Prof. Code, § 6068, subd. (b)), and an unambiguous display of "offensive personality" (Bus. & Prof. Code, § 6068, subd. (f)).

In this state there are approximately 800 trial court judges. In the fiscal year July 1, 1970 to June 30, 1971, 7,762 superior court and 12,260 municipal court juries were sworn to try cases.[5] In 1969-1970 the totals were about the same. This court can take judicial notice of the fact that the number of citations of attorney contempt is de minimis when compared to the volume of jury cases processed.

It is readily apparent from this brief statistical analysis that the overwhelming majority of lawyers are conducting themselves in the manner required by law and expected by society.

When a lawyer violates his duty, the sanctions of the law should be imposed swiftly. Appellate courts should be scrupulously hesitant to "second-

[5] Annual Report of The Administrative Office of the California Courts (Jan. 1972).

guess" the actions of a trial judge who alone is—to use contemporary vernacular jargon—"where the action is."

If the integrity of our judicial system is to be maintained and if the confidence of the citizenry in it is to be restored, we should broaden, not weaken the authority of the trial courts to control the conduct of those persons—particularly attorneys—who appear there; and the one and only meaningful tool which the law gives to the trial judge to maintain control of lawyers who violate their duty is the power of contempt.

I would affirm the order of contempt in its entirety.

Petitioner's application for a hearing by the Supreme Court was denied May 23, 1972.