[Crim. No. 16621. In Bank. Oct. 19, 1973.]

In re LAWRENCE BUCKLEY on Habeas Corpus.

## Counsel

Keith C. Monroe for Petitioner.

Adrian Kuyper, County Counsel, Charles B. Sevier, Deputy County Counsel, Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, Oretta D. Sears and Alicemarie Stotler, Deputy District Attorneys, for Respondents.

## Opinion

**SULLIVAN, J.**—In this proceeding in habeas corpus,[1] petitioner Lawrence Buckley, an attorney, seeks to annul an order of the Orange County Superior Court adjudging him in direct contempt of court, and sentencing him to jail for five days and imposing a fine of $500.[2]

The alleged contempt occurred in open court during the jury trial of a criminal case in which petitioner represented the defendant. In the course of the case in defense, petitioner unexpectedly called as a witness the prosecutor Mr. Brian, a deputy district attorney.[3] The judge thereupon admon-

---

[1] Petitioner sought a writ of habeas corpus or in the alternative a writ of certiorari. Either remedy is properly invoked. (*John Breuner Co.* v. *Bryant* (1951) 36 Cal.2d 877, 878 [229 P.2d 356]; *In re Circosta* (1963) 219 Cal.App.2d 777, 785 [33 Cal.Rptr. 514].) We chose to treat the petition as one praying for a writ of habeas corpus and issued an order to show cause. Respondents superior court and Sheriff of Orange County have filed separate returns.

[2] The order also provided that, in the event of failure to pay the fine, petitioner should serve, in addition to the five days, one day for each $25 of the fine remaining unpaid.

[3] "MR. BUCKLEY: Call Mr. Brian.

"MR. BRIAN: Who did he say?

ished and excused the jury and the following proceedings were had in open court, outside the presence of the jury.

We shall set forth in some detail the subsequent events so that the alleged contempt can be viewed in its proper setting.[4] After the jury was excused, an argument ensued in open court, at the start of which the prosecutor requested that the judge order petitioner to make an offer of what he expected to prove by calling the prosecutor as a witness. The pertinent portions of the record are set forth below.[5]

Asserting that he had the right to call the prosecutor or any other witness, petitioner continued as follows: "I don't believe the District Attorney stands in any stead or difference from any other witness, and if I want to call him as a witness I have a right to call him as a witness. Objections can be interposed question by question.

"THE COURT: Mr. Brian.

"MR. BUCKLEY: Mr. Patrick Brian.

"MR. BRIAN: Your Honor, before we get into any of Mr. Buckley's nonsense, may we have a hearing on that matter at the bench?

"THE COURT: Well, the jury goes back into that nice lovely room. . . ."

[4] The order adjudging petitioner in contempt attaches and incorporates as a part thereof a transcript of a portion of the oral proceedings described as the "colloquy" leading up to the alleged contempt.

[5] "MR. BRIAN: Your Honor, just for the record—

"THE COURT: Give him a chance. He hasn't explained why he wants to call you.

"MR. BRIAN: Before he does that, would the Court ask counsel to make an offer of proof regarding the evidence that he purports to elicit from me.

"THE COURT: I expect to get that.

"MR. BRIAN: And the relevancy of it, and any type of justification for that conduct.

"MR. BUCKLEY: I think the record should show that in the courtroom is Mr. Farnell, a Deputy District Attorney. The District Attorney is going to assert, in opposition to me calling him as a witness, that people would be without counsel.

"MR. BRIAN: I'm making no such argument.

"MR. BUCKLEY: Age-old argument that will resolve itself. Mr. Farnell could substitute in.

"THE COURT: I'm waiting to hear what you propose to prove by calling Mr. Pat Brian, Deputy District Attorney of the County of Orange.

"MR. BUCKLEY: Well, if the Court would give me a recess I'd have a personal conversation with Mr. Brian, an interview, and if he would answer my questions then I would be able to really know whether he can testify to material things. I think he can.

"THE COURT: Such as?

"MR. BUCKLEY: Well, the Court got involved in an order directing the defense to make available to the prosecution the names and addresses of alibi witnesses. The cases seem to indicate that's about as much from the defense, in terms of discovery, as the Court can order."

"THE COURT: I don't believe so, in view of his status in the case. You have an obligation—

"MR. BUCKLEY: The Court should let me finish my position so that the record is clear.

"THE COURT: I thought you had finished. I didn't know you went on forever.

"MR. BUCKLEY: The Court's persistent interruptions—

"THE COURT: Don't characterize my conduct as persistent interruptions or I'll cite you for contempt. Get on with your argument.

"MR. BUCKLEY: I lost my train of thought because of the Court's interruption."

Petitioner then reiterated his position that he was not required to make an offer of proof and the prosecutor renewed his objection. The following then occurred.

"MR. BRIAN: And I renew my objection. There's been no showing whatever that I have anything to offer in the case, and I've learned by sad experience not to talk to Mr. Buckley in person, and I refuse to do it unless there's a witness present. [¶] I have nothing to offer this case. I'm the prosecutor, and I refuse to take the stand. It's one of his cheap tricks.

"THE COURT: I'm not interested in your characterization.

"MR. BRIAN: I withdraw my characterization.

"MR. BUCKLEY: Would the Court ask the District Attorney to apologize.

"THE COURT: Did you apologize for calling him stupid?

"MR. BUCKLEY: Did I call him stupid?

"THE COURT: Yes, you did."

After a further exchange, the judge sustained the prosecutor's objection to being called as a defense witness. Petitioner continued to argue to the court. "MR. BUCKLEY: I don't call witnesses that won't offer relevant testimony, and this witness will offer relevant and material testimony.

"THE COURT: You'll have to first tell me what that is.

"MR. BUCKLEY: I think the Court and the prosecution bear a heavy burden.

"THE COURT: Stop telling me about my burden. Either comply with the order or sit down.

"MR. BUCKLEY: What is the order?

"THE COURT: The order is unless you tell me the relevant information I'm not going to permit you to call him.

"MR. BUCKLEY: Is that going to be so with every witness?

"THE COURT: No, that only applies to the District Attorney."

A lengthy exchange between petitioner and the court then ensued, during which petitioner argued that he was entitled to interrogate the prosecutor about oral statements made to him by defendants, since such statements would have been discoverable anyhow had they been reduced to writing. When asked by the court for authority supporting such a position, petitioner continued: "MR. BUCKLEY: I call upon the Court's experience as a judge that everything isn't written down in law books, that new questions arise every day that aren't in the cases.

"THE COURT: You don't have authority for it, is that it? It's denied.

"MR. BUCKLEY: The District Attorney—

"THE COURT: I don't want to hear the argument. It's denied.

"MR. BUCKLEY: The District Attorney has none to the contrary. It's consistent with all other—

"THE COURT: I've heard enough argument on it.

"MR. BUCKLEY: I'll cite to the Court *In Re Ferguson,* 5 Cal.3d 525, which talks about the obligation of the District Attorney to turn over to the defense, even without request, all information of a substantial and material nature; says nothing about whether it is written or not. In fact, the Court says there is no need for the defense to make a written notice that will just clog the Court's file with unnecessary paperwork. [¶] That's my case. I rely on that. [¶] I'll move the Court for a mistrial.

"THE COURT: Denied.

"MR. BUCKLEY: *This Court obviously doesn't want to apply the law.*

"THE COURT: Stop insulting me and sit down. [¶] Don't tell me I don't want to apply the law. It's grossly insulting and this time I'm going to cite you for contempt. For grossly contemptuous behavior in impugning to this Court a willful desire not to apply the law. It is highly insulting, highly un-

true, and you're punished with five days in the Orange County jail and a fine of five hundred dollars, the sentence to take effect upon the conclusion of this trial. It will be stayed until the verdict is rendered in this case."[6] (Italics added.)

At the start of the proceedings on the following morning, petitioner in open court and outside the presence of the jury apologized to the court for being late. In the ensuing colloquy between petitioner and the court, during which petitioner remarked that "this Court has questions about my credibility," petitioner apologized to the court for "the comment I made yesterday."[7] The record discloses, however, that the judge upon further reflection chose to regard the proffered apology as having "poured salt on the wound."[8]

During the afternoon session that day, petitioner in open court and out of the presence of the jury addressed the judge on the subject of his prior apology and the court's subsequent observation that the apology "only magnified the nature of the contempt." His inquiry as to why the judge had rejected the apology was met by the judge's response that he "never accepted it or rejected it" but had considered that the apology "only magnified the insult, because the accusation was a charge on the integrity of this court. The accusation was, I knew the law, and didn't obey it. So merely stating I knew the law, merely emphasized the fact that I had no integrity."[9]

[6]The judge then ordered a 10-minute recess. There is no indication in the record nor in the contempt order that the recess was necessary to maintain order or was in any way a result of petitioner's remark.

[7]"Mr. Buckley: Well, with respect to the comment I made yesterday, I apologize to the Court. That was a comment made perhaps in the heat of anger or combat, and I do apologize, because I do respect this Court and the Court's legal knowledge, and I disagree with the Court, but I don't disrespect it.

"The Court: I'll see whether that's made in good faith by the manner in which you conduct yourself the remainder of this trial.

"Mr. Buckley: I'll do my best to support it."

[8]"Of course, the record will also show that I cited Mr. Buckley for contempt yesterday and his purported apology this morning. He accused me of willfully disobeying the law in order to help the prosecution to conduct an unfair trial in behalf of his client. I'd much rather be accused of stupidity than of malice.

"Today Mr. Buckley was kind enough to say he respected my knowledge of the law, which only made the charge of willfully disobeying it all the more serious. Rather than expunging the contempt, it poured salt on the wound, because with all my purported knowledge of the law, there would be even less excuse in Mr. Buckley's eyes for my disobedience of it."

[9]It is interesting to note that at that point petitioner appears to have pursued a course of interrogating the court in respect to his above position. "Mr. Buckley: That was the Court's position . . . ?

"The Court: That's as I understand it.

Declining to exonerate petitioner for his allegedly contemptuous remark, the judge made and filed a written order adjudicating petitioner in contempt, which we set forth in relevant part in the margin.[10] Petitioner was taken into custody but was later released. This proceeding in habeas corpus followed.[11]

"MR. BUCKLEY: All right. In any event, did anything transpire this morning between the time I made the apology and when the Court interpreted the apology?

"THE COURT: Well, I had a chance to think about the language.

"MR. BUCKLEY: Nothing occurred on the record that indicated the apology was not made in good faith?

"THE COURT: I'm not sure, but I don't think so at the moment. Are you testing me subjectively? I can't think of anything at the moment.

"MR. BUCKLEY: I was trying to—see, today I was quite startled with the statement the Court made, because I had made the apology in good faith and I thought the Court was at least considering—

"THE COURT: In my opinion, the so-called apology does not exonerate a lawyer who behaves contemptuously in the presence of the Court. I don't think it's an excuse for contemptuous conduct. . . ."

[10]"It is hereby found, ordered and adjudged that:

"(1) On September 19, 1972, in the immediate presence and view of the Court, during proceedings in the above-entitled action, Lawrence Buckley, counsel for defendant, stated in open court that the Trial Judge 'obviously does not want to apply the law,' in a colloquy the full portion of which is attached hereto and made a part hereof.

"(2) Such statement in effect accused the Trial Judge of lack of integrity, tended to interrupt the due course of the trial then in progress, and constituted contemptuous behavior.

"(3) For said contempt, said Lawrence Buckley is hereby committed to the custody of the Sheriff of Orange County for Five Days and is hereby fined the Sum of Five Hundred Dollars ($500.00), plus penalty assessment.

". . . . . . . . . . . . . .

"(4) After said contempt, said Lawrence Buckley said he 'apologized' and respected the Court's knowledge of the law. Such purported 'apology' served only to emphasize the previous attack on the integrity of the Court, which in effect, charged the Court with knowing the law and deliberately refusing to obey it. *The transcripts regarding said apology are also attached hereto and made a part hereof. HSH*

"(5) A stay of only those provisions of this order committing the said Lawrence Buckley to the custody of the Sheriff of Orange County is granted until verdict is rendered or the jury discharged in the above-entitled proceeding.

"(6) A further stay of only those provisions committing said Lawrence Buckley to the custody of the Sheriff of Orange County shall be granted upon the institution by said Lawrence Buckley of appropriate proceedings to review the within adjudication of contempt in a higher court and upon posting of bail in the sum of One Thousand ($1,000.00) Dollars." (Italicized portion handwritten and initialed by judge.)

[11]Although the order to show cause named only the Sheriff of Orange County, both the superior court (represented by the county counsel) and the sheriff (represented by the district attorney) have filed "answers" and written returns. Both parties will be referred to herein as respondent.

Petitioner directs a three-pronged attack on the order adjudicating him in contempt. His contentions may be summarized as follows: (1) That the order is insufficient on its face to support the jurisdiction of the trial court and is not supported by the record; (2) that under the circumstances of the case, the trial judge was required, as a matter of due process, to refer the charge of the alleged contempt to another judge for adjudication; and (3) that California procedure in contempt matters, insofar as it fails to provide for a stay or an appeal as a matter of right, denies a contemner the equal protection of the laws.

## I

Preliminarily we make some observations as to the order under review. Fairly read, it indicates that petitioner was found to be in contempt only for a single act of misconduct—his statement in open court that "This Court obviously doesn't want to apply the law." (See fn. 10, *ante*, and text accompanying fn. 6.)[12] Nowhere does the order state that petitioner made this statement in a loud, boisterous, insolent or rude manner. It does recite, however, that the statement "tended to interrupt the due course of the trial then in progress," language almost identical with that found in subdivision 1 of section 1209 of the Code of Civil Procedure.[13] We additionally observe that there are attached to, and made a part of the order, transcripts of the full portion of the colloquy between petitioner and the court (see fn. 10, *ante*, 1st par.) as well as of petitioner's apology (*id.*, 4th par.).

These preliminary matters out of the way, we turn to petitioner's first contention. Essentially his point is this: That the order of contempt rests

---

[12]The order is sufficiently specific to preclude any conjecture that it might be based on other acts of petitioner. The first sentence of the order quotes the remark and attaches a copy of the transcript to show the context in which it was made. The next sentence charges that *"Such statement* in effect accused the Trial Judge of lack of integrity, tended to interrupt the due course of the trial then in progress, and constituted contemptuous behavior." (Italics added.)

For this reason, facts concerning other behavior by petitioner are relevant only to the extent that they shed light on the intent with which the remark was made or the effect which the remark had on the proceedings. Other conduct may not serve as independent grounds for contempt, since to do so would violate the requirement that the facts show, without the aid of speculation, that a contempt occurred. (*Chula* v. *Superior Court* (1962) 57 Cal.2d 199, 203 [18 Cal.Rptr. 507, 368 P.2d 107, 97 A.L.R.2d 421].)

[13]Section 1209 provides in pertinent part: "The following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: [¶] 1. Disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to interrupt the due course of a trial or other judicial proceeding."

Hereafter, unless otherwise indicated, all section references are to the Code of Civil Procedure.

on a single remark of nine words alleged to be contemptuous; that such statement was not found to have been made in a loud, boisterous or offensive manner; that although found to have tended to interrupt the due course of the trial, such finding is totally unsupported by the record; and that, as a result, petitioner's statement did not constitute contempt.

In reviewing an adjudication of contempt, "the sole question before us is one of jurisdiction of the trial court to render the judgment under review, and in such a case the review of the evidence is limited to determining whether there was any substantial evidence to sustain the jurisdiction of the trial court." (*The Times-Mirror Co.* v. *Superior Court* (1940) 15 Cal.2d 99, 115 [98 P.2d 1029], revd. other grounds (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346]; *Bridges* v. *Superior Court* (1939) 14 Cal.2d 464, 484 [94 P.2d 983], revd. other grounds (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346].) More recently we said that "the responsibility of the reviewing court is merely to ascretain whether there was sufficient evidence before the trial court to sustain the judgment and order. The power to weigh the evidence rests with the trial court." (*In re Ciraolo* (1969) 70 Cal.2d 389, 394 [74 Cal.Rptr. 865, 450 P.2d 241], citing *Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 409-410 [42 Cal.Rptr. 441, 398 P.2d 777], and *Bridges* v. *Superior Court, supra,* 14 Cal.2d at p. 485.)

The requirements of the order adjudicating contempt have been given expression in numerous opinions. In *Arthur* v. *Superior Court, supra,* 62 Cal.2d at page 407, we observed: "Section 1211 of the Code of Civil Procedure establishes the procedure that is to be followed in adjudging persons in contempt of court. Contempt committed in the immediate view and presence of the court, known as direct contempt, may be treated summarily. All that is required is that an order be made reciting the facts, adjudging the person guilty and prescribing the punishment." We have emphasized, however, that such an order is valid only if it recites facts with sufficient particularity to demonstrate on its face that petitioner's conduct constituted a legal contempt. (*Chula* v. *Superior Court, supra,* 57 Cal.2d at p. 203; *Raiden* v. *Superior Court* (1949) 34 Cal.2d 83, 86 [206 P.2d 1081]; *Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784, 795 [192 P.2d 905].)

It is well established that a court has inherent power to punish for contempt of court (*In re McKinney* (1968) 70 Cal.2d 8, 10-11 [73 Cal. Rptr. 580, 447 P.2d 972] and cases there cited). As this court declared many years ago in a case repeatedly cited with approval, this inherent power "is a necessary incident to the execution of the powers conferred

upon the court, and is necessary to maintain its dignity, if not its very existence." (*In re Shortridge* (1893) 99 Cal. 526, 532 [34 P. 227].)

 Thus it is the settled law of this state that an attorney commits a direct contempt when he impugns the integrity of the court by statements made in open court either orally or in writing. (*In re Ciraolo, supra,* 70 Cal.2d 389, 394-395 (false accusation in affidavit); *Hume* v. *Superior Court* (1941) 17 Cal.2d 506, 513-514 [110 P.2d 669] (false charge of collusion of judge with Attorney General); *Blodgett* v. *Superior Court* (1930) 210 Cal. 1, 16 [290 P. 293, 72 A.L.R. 482] (false charge of corruption in legal memorandum); *Matter of Shay* (1911) 160 Cal. 399, 407-408 [117 P. 442] (letter imputing improper conduct to Supreme Court justices); *Lamberson* v. *Superior Court* (1907) 151 Cal. 458, 462-464 [91 P. 100] (affidavit to disqualify judge charging corrupt and improper motives); *In re Grossman* (1972) 24 Cal.App.3d 624, 634-640 [101 Cal.Rptr. 176] (false accusations against judge); *Gillen* v. *Municipal Court* (1940) 37 Cal.App.2d 428, 429, 431 [99 P.2d 555] (oral statement that opposing counsel won before he started); *Hallinan* v. *Superior Court* (1938) 27 Cal.App.2d 433, 438-439 [81 P.2d 254] (affidavit charging dishonesty of presiding judge); *In re Friday* (1934) 138 Cal.App. 660, 663 [32 P.2d 1117] (objections to court's rulings falsely charging trial judge with improper conduct); *Ex parte Ewell* (1925) 71 Cal.App. 744, 747-748 [236 P. 205] (letter attacking judge); *Matter of Application of Lapique* (1915) 26 Cal.App. 258 [146 P. 690] (affidavit in support of motion for change of venue imputing lack of integrity in judge). See 4 Witkin, Cal. Procedure (2d ed. 1971), pp. 2973-2974.)[14] Insolence to the judge in the form of insulting words or conduct in court has traditionally been recognized in the common law as constituting grounds for contempt. (Oswald on Contempt (1911) pp. 51-54.) As we recently said in

---

[14]Section 1209 establishes a list of acts or omissions which may constitute contempt of court, including "1. Disorderly, contemptuous or insolent behavior toward the judge while holding the court, *tending to interrupt the due course of a trial* or other judicial proceeding." (Italics added.) The list is not exclusive, however, for the power of a court to punish by contempt an act which impugns its integrity exists independent of statute. (Cf. *In re Shortridge, supra,* 99 Cal. at p. 532.) "The legislative department may regulate the procedure and enlarge the power, but it cannot without trenching upon the constitutional powers of the court and destroying the autonomy of that system of checks and balances, which is one of the chief features of our triple-department form of government, fetter the power itself." (*Id.*) (See also *In re San Francisco Chronicle* (1934) 1 Cal.2d 630, 634-635 [36 P.2d 369].)

We note that the contempt order here states that petitioner's remark "accused the Trial Judge of lack of integrity." Such conduct, if supported by the record, may be punished by contempt under the general rule set forth in the text, *supra.* We need not consider whether the remark also tended to interrupt the due course of the trial, as the order alleges, so as to justify independent grounds for contempt under section 1209, subdivision 1.

*Ciraolo, supra,* quoting from *Friday, supra,* and *Lamberson, supra,* " 'The judge of a court is well within his rights in protecting his own reputation from groundless attacks upon his judicial integrity and it is his bounden duty to protect the integrity of his court.' (*In re Friday, supra,* 138 Cal.App. 660, 663; see also *Daily* v. *Superior Court, supra,* 4 Cal.App.2d 127, 133 [40 P.2d 936].) 'However willing he may be to forego the private injury, the obligation is upon him by his oath to maintain the respect due to the court over which he presides.' " (*In re Ciraolo, supra,* at pp. 394-395.)[15]

Nevertheless we have warned that the judge's ultimate weapon of the summary contempt power "must be exercised with great caution, lest it stifle the freedom of thought and speech so necessary to a fair trial under our adversary system. That system is built upon the belief that truth will best be served if defense counsel is given the maximum possible leeway to urge in a respectful but nonetheless determined manner, the questions, objections, or argument he deems necessary to the defendant's case: 'He has a right to press a legitimate argument and to protest an erroneous ruling.' [Citation.] Indeed, so essential is this 'fundamental interest of the public in maintaining an independent bar' . . . that 'a mere mistaken act by counsel cannot render him in contempt of court. Even if a legal proposition is untenable, counsel may properly urge it in good faith; he may do so even though he may not expect to be successful, provided of course, that he does not resort to deceit or to wilful obstruction of the orderly processes.' " (*Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 560 [68 Cal.Rptr. 1, 440 P.2d 65], quoting *Gallagher* v. *Municipal Court, supra,* 31 Cal.2d 784, 788, 795, 796.) When, however, aggressive advocacy gives way to insolence and disrespect towards the court and particularly when it degenerates into "impertinent, scandalous, insulting or contemptuous language reflecting on the integrity of the court" (*Hume* v. *Superior Court, supra,* 17 Cal.2d at p. 513) it is the trial judge's "bounden duty to protect the integrity of his

---

[15]Distinguishable from these cases are decisions holding that an attorney is not guilty of contempt of court when in good faith he states facts which he believes to be true and which support allegations of bias made in connection with a motion to disqualify a judge. (*Woolley* v. *Superior Court* (1937) 19 Cal.App.2d 611, 627-628 [66 P.2d 680]; *In re Cunha* (1932) 123 Cal.App. 625, 635 [11 P.2d 902, 18 P.2d 979].) Also distinguishable from the cases cited above are those instances of contemptuous behavior where the judge may be subject "to ridicule and insult by intonations and gestures accompanying words wholly innocuous. . . ." (*Gallagher* v. *Municipal Court, supra,* 31 Cal.2d at p. 796.) We have held that in such cases, "something more is required to support the order than the mere recital therein that the tone of voice used was contemptuous." (*In re Hallinan* (1969) 71 Cal.2d 1179, 1181-1182 [81 Cal.Rptr. 1, 459 P.2d 255].) The record must show that the judge first warned the attorney that his tone of voice and facial expression are offensive. (*Id.* at p. 1185; *Gallagher* v. *Municipal Court, supra,* at p. 797.)

court." (*In re Friday, supra,* 138 Cal.App. at p. 663; see *Lamberson* v. *Superior Court, supra,* 151 Cal. at pp. 461-462.)

Applying the foregoing authorities to the matter before us, we think it is manifest that petitioner's statement constituted an attack on the integrity of the court. The offending language—"[t]his Court obviously doesn't want to apply the law"—fairly read, means, as indeed the trial judge took it to mean, that the judge knew the law but deliberately chose to ignore it. In essence the statement does not constitute a mere accusation of bias, that is, a mere "condition of mind" (*Estate of Friedman* (1918) 178 Cal. 27, 39 [172 P. 140]) or merely a " 'leaning of the mind; propensity or prepossession toward an object or view, not leaving the mind indifferent' " (*Evans* v. *Superior Court* (1930) 107 Cal.App. 372, 380 [290 P. 662] quoting from Webster's New Internat. Dict.)

In our view the statement goes beyond one reflecting a mere mental outlook or predilection and makes a charge of deliberate judicial dishonesty. ■ We are of the opinion that the record does not support such an accusation against the judge and that the statement was insolent, offensive, insulting, and impunged the integrity of the court. We conclude that the statement was contemptuous on its face.[16] Since the contempt order is not based on "words wholly innocuous" (*Gallagher* v. *Municipal Court, supra,* 31 Cal.2d at p. 796) or on "language of which is in itself not insolent, contemptuous or disorderly" (*In re Hallinan, supra,* 71 Cal.2d at p. 1181) the judge was not required first to warn petitioner before taking disciplinary action against him. (*Gallagher, supra,* at p. 797; *In re Hallinan, supra,* at p. 1183.)

Petitioner contends, however, that reversal of the order before us is compelled by the recent decision of the United States Supreme Court in *In re Little* (1972) 404 U.S. 553 [30 L.Ed.2d 708, 92 S.Ct. 659]. There the contemner-petitioner, a layman, attempted to act as his own attorney in a

---

[16]The remark for which petitioner was cited appears to have been the climax to several prior impertinent remarks directed at the judge by petitioner. (See text between fns. 5 and 6, *ante.*) Thus, both on its face and within the context in which it was uttered, it appears to be contemptuous.

Pertinent here is the following from *Gillen* v. *Municipal Court, supra,* 37 Cal. App.2d 428, 431: "However, it is clear said municipal court had jurisdiction of the proceedings pending before it. It also had jurisdiction to determine what was or was not contemptuous language. Unless we can say, as a matter of law, that said language was susceptible of that construction only, for which the petitioner now contends, we may not say the trial court exceeded its jurisdiction. The language used by the petitioner is to be considered in connection with all of the surrounding circumstances. Having read the record with due care we are unable to say, as a matter of law, that the trial court did not properly construe the language used by petitioner."

state criminal trial, when his retained counsel was unable to appear and the petitioner was unable to obtain a continuance. In his summation (the opinion not indicating whether trial was to the court or to a jury) the petitioner made statements that the court was biased and had prejudged the case, and that the petitioner was a political prisoner. The court adjudged him in contempt after concluding that his conduct and words were contemptuous and " 'reflected on the integrity of the Court and tended to subvert and prevent justice.' " (*Id.* at p. 554 [30 L.Ed.2d at p. 710].) Habeas corpus relief was denied by an intermediate appellate state court which upheld the adjudication in a judgment that tracked "the statutory language in reciting that petitioner's statements 'directly tended to interrupt its proceedings and to impair the respect due the [trial court's] authority.' " (*Id.* at p. 554 [30 L.Ed.2d at p. 710].)[17]

In what appears to be a narrow holding, the United States Supreme Court in a per curiam opinion reversed the judgment. "We hold that *in the context of this case* petitioner's statements in summation did not constitute criminal contempt. The court's denial of the continuance forced petitioner to argue his own cause. He was therefore clearly entitled to as much latitude in conducting his defense as we have held is enjoyed by counsel vigorously espousing a client's cause. *In re McConnell* (1962) 370 U.S. 230. There is no indication, and the State does not argue, that petitioner's statements were uttered in a boisterous tone or in any wise actually disrupted the court proceeding. Therefore, 'The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil . . . . [T]he law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate.' *Craig* v. *Harney,* 331 U.S. 367, 376 (1947). 'Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.' (*Brown* v. *United States,* 356 U.S. 148, 153 (1958)." (*Id.* at p. 555 [30 L.Ed.2d at pp. 710-711]; italics added.)

---

[17]The appellate court also held that the trial court's conclusion amounted to a finding that the words tended to interrupt the court's proceedings and to impair respect due its authority.

As noted in *Little* (*id.* at p. 555, fn. [30 L.Ed.2d at p. 710]), a North Carolina statute made punishable for contempt " '[d]isorderly, contemptuous, or insolent behavior committed during the sitting of any court of justice, in immediate view and presence of the court, and directly tending to interrupt its proceedings, or to impair the respect due to its authority.' "

We have some difficulty in attempting to determine whether the United States Supreme Court's decision in *Little* compels, as petitioner contends, a reversal of the contempt order here. Initially, it may be noted, the court chose to limit its holding to "the context of this case," emphasizing the special circumstances with which it was faced: the contemner was a layman, inexperienced in the rules of courtroom decorum, who was attempting to defend himself in a criminal trial after his counsel had failed to appear. It is not surprising that such a person would make improper remarks in his final argument without realizing that he was subjecting himself to the extraordinary power of summary contempt. Secondly, although the high court's opinion gives the gist of the petitioner's remarks, it does not quote the words actually used, so that we cannot discern their offensive or innocuous character on their face.

Our reading of *Little* is further complicated by our inability to detect the specific constitutional infirmity dictating the high court's result. The court merely concluded that reversal of the conviction was required by its earlier holding in *Holt* v. *Virginia* (1965) 381 U.S. 131 [14 L.Ed.2d 290, 85 S.Ct. 1375].[18] In *Holt,* the defendant attorneys had charged that their summary adjudication of contempt violated the due process clause of the Fourteenth Amendment. The United States Supreme Court agreed, holding that due process requires the states to allow attorneys to file proper motions that are necessary to ensure a fair trial, an essential element of due process.[19] It is important to note, however, that in *Holt* "the words used in

---

[18]"The reversal of this conviction is necessarily required under our holding in *Holt* v. *Virginia,* 381 U.S. 131 (1965). There attorneys filed motions that the trial judge recuse himself and for a change of venue, alleging that the judge was biased. The motion for change of venue alleged that the judge intimidated and harassed the attorney's client. The court adjudged the attorneys in contempt for filing these motions. We reversed for reasons also applicable here: [¶] 'It is not charged that petitioners here disobeyed any valid court order, talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties. Their convictions rest on nothing whatever except allegations made in motions for change of venue and disqualification of Judge Holladay because of alleged bias on his part.' *Id.,* at 136." (*In re Little, supra,* 404 U.S. at p. 556 [30 L.Ed.2d at p. 711].)

[19]"And it is settled that due process and the Sixth Amendment guarantee a defendant charged with contempt such as this 'an opportunity to be heard in his defense—a right to his day in court— . . . and to be represented by counsel.' [Citations.] The right to be heard must necessarily embody a right to file motions and pleadings essential to present claims and raise relevant issues. [Citation.] And since 'A fair trial in a fair tribunal is a basic requirement of due process,' [citation], it necessarily follows that motions for change of venue to escape a biased tribunal raise constitutional issues both relevant and essential. [Citations.] Consequently, neither Dawley nor his counsel could consistently with due process be convicted for

the motions were *plain English, in no way offensive in themselves, and wholly appropriate to charge bias* in the community and bias of the presiding judge." *(Holt* v. *Virginia, supra,* 381 U.S. at p. 137 [14 L.Ed.2d at p. 294]; italics added.)[20]

■ We read *Holt* as merely affirming, upon constitutional grounds of due process, the settled rule that an attorney may not be summarily adjudged in contempt for aggressive but respectful advocacy. This rule and its limitations are eloquently set forth in *Sacher* v. *United States* (1952) 343 U.S. 1 [96 L.Ed. 717, 72 S.Ct. 451], in upholding the summary conviction of an attorney for direct contempt committed while representing the defendant in a criminal case.[21] (See also *Fisher* v. *Pace* (1949) 336 U.S. 155,

---

contempt for filing these motions *unless it might be thought that there is something about the language used which would justify the conviction."* *(Holt* v. *Virginia, supra,* 381 U.S. at pp. 136-137 [14 L.Ed.2d at pp. 293-294]; italics added.)

[20]The court expressly declined to pass on the question whether summary convictions of the attorneys were invalid because the alleged misconduct did not disturb the court's business or threaten demoralization of its authority. *(Holt* v. *Virginia, supra,* 381 U.S. at pp. 135-136, fn. 2 [14 L.Ed.2d at p. 293].)

[21]"Our criminal processes are adversary in nature and rely upon the self-interest of the litigants and counsel for full and adequate development of their respective cases. The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers. But their strife can pervert as well as aid the judicial process unless it is supervised and controlled by a neutral judge representing the overriding social interest in impartial justice and with power to curb both adversaries. The rights and immunities of accused persons would be exposed to serious and obvious abuse if the trial bench did not possess and frequently exert power to curb prejudicial and excessive zeal of prosecutors. The interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders.

"Of course, it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts. *But if the ruling is adverse, it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal.* During a trial, lawyers must speak, each in his own time and within his allowed time, and with relevance and moderation." *(Sacher* v. *United States, supra,* 343 U.S. at pp. 8-9 [96 L.Ed. at p. 723]; italics added.)

See also *Illinois* v. *Allen* (1970) 397 U.S. 337, 343 [25 L.Ed.2d 353, 358-359, 90 S.Ct. 1057], in which the Supreme Court set the constitutional guidelines by which a criminal defendant may be silenced for disruptive conduct: "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stub-

163 [93 L.Ed. 569, 574, 69 S.Ct. 425]; *United States* v. *Schiffer* (6th Cir. 1965) 351 F.2d 91, 94; *Raiden* v. *Superior Court, supra,* 34 Cal.2d at p. 86; *Gallagher* v. *Municipal Court, supra,* 31 Cal.2d at pp. 796-797; 4 Witkin, Cal. Procedure (2d ed. 1971), pp. 2970-2973.) We do not think that *Little,* the holding of which was carefully limited to the particular facts of that case, was intended to broaden this time-honored rule in order to protect insulting and disrespectful argument that serves no purpose other than to vent an attorney's anger.[22]

■ Unlike the attorneys' affidavit in *Holt,* petitioner Buckley's remark was not "plain English, in no way offensive in [itself], and wholly appropriate to charge bias . . . ." (*Holt* v. *Virginia, supra,* 381 U.S. at p. 137 [14 L.Ed.2d at p. 294].) Rather, the remark "This court obviously doesn't

---

bornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." These words apply a fortiori to conduct by attorneys, who, by their position and training, have the duty to insure order in our judicial system.

[22]Further cause for confusion arises from references in *Little* which might be read as implying that, to be punishable for direct contempt, conduct must result in " 'an imminent, not merely a likely, threat to the administration of justice.' " (*In re Little, supra,* 404 U.S. at p. 555 [30 L.Ed.2d at p. 711], quoting *Craig* v. *Harney* (1947) 331 U.S. 367, 376 [91 L.Ed. 1546, 1552, 67 S.Ct. 1249]) or an "obstruction to the administration of justice." (*Id.,* quoting *Brown* v. *United States* (1958) 356 U.S. 148, 153 [2 L.Ed.2d 589, 595, 78 S.Ct. 622, 72 A.L.R.2d 818].) Petitioner seizes upon this language in arguing that, to be punishable for contempt, conduct must somehow physically disrupt the proceedings.

We are unconvinced that the United States Supreme Court, in stating the above-quoted dicta, intended to limit the contempt power of state courts to apply only to those cases in which there has been a physical obstruction to the administration of justice. An examination of *Craig* and *Brown* supports this conclusion. In *Craig,* the Supreme Court reversed an adjudication of constructive contempt against several newspapermen for articles attacking a judicial ruling. The decision is based upon the traditionally zealous protection of freedom of the press under the First Amendment. Unlike a newspaper, a courtroom is not a proper forum for free-wheeling exchange of ideas. An attorney's freedom of speech in this setting must be tempered to insure that courts of law accomplish that for which they were created—dispensing justice in a reasonable, efficient and fair manner. In short, we fail to see how the rule of *Craig* applies to a case involving direct contempt by an attorney.

Nor does the test employed in *Brown* apply to this case. *Brown* dealt with the power of a *federal* court to punish for direct contempt. The federal contempt power is defined by a federal statute passed in 1831 which has long been held to limit the power of federal courts to summarily punish for contemptuous conduct. This statute, 18 United States Code, section 401, states in relevant part: "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—[¶] (1) Misbehavior of any person in its presence or so near thereto as to *obstruct the administration of justice.*" (Italics added.)

*Brown* merely restates the federal statutory rule, which "does not, however, reflect the constitutional limits of the states' contempt powers." (*Weiss* v. *Burr* (9th Cir. 1973) 484 F.2d 973, 982, fn. 13.)

want to apply the law" was contemptuous on its face, had no basis in fact, and was not made in furtherance of any legitimate motion to disqualify the judge. It merely served to emphasize petitioner's displeasure with the court's refusal to rule in his favor. "But if the ruling is adverse, it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal." (*Sacher* v. *United States, supra,* 343 U.S. at p. 9 [96 L.Ed. at p. 723].)

We hold here that when petitioner's argument turned from advocacy to insult, the trial court was acting properly in holding him in contempt. We are of the opinion that *Little* does not derogate from the settled California rule set forth by us, *supra* (see text accompanying fn. 14, *ante*) that an attorney commits a direct contempt when he impugns the integrity of the court by statements in open court. Indeed, in our view, *Little* not only rests on a different principle but is also distinguishable on its facts. We have endeavored to evaluate petitioner's language in the perspective of the trial, mindful of the fact that he is an advocate pressing his claim, according him "[f]ull enjoyment of that right, with due allowance for the heat of controversy" (*Sacher* v. *United States, supra,* 343 U.S. at p. 9 [96 L.Ed. at p. 723]), and sensitive to the hazard that in vindicating the dignity and authority of the court, the judge's contempt power must not become "an instrument of tyranny." (*Fisher* v. *Pace, supra,* 336 U.S. at p. 163 [93 L.Ed. at p. 574]; Douglas, dissenting.) In the light of all these circumstances, we cannot say that petitioner's conduct was as a matter of law not contemptuous.

## II

We now turn to petitioner's argument that the trial judge was required, as a matter of due process, to refer the matter of adjudication of the alleged contempt to another judge. Petitioner relies upon *Mayberry* v. *Pennsylvania* (1971) 400 U.S. 455 [27 L.Ed.2d 532, 91 S.Ct. 499], for the proposition that a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemner.

In *Mayberry,* the Supreme Court overturned adjudications of contempt made in a state proceeding. Three defendants, none of them a lawyer, represented themselves in a criminal trial before a jury. At the end of the trial, the judge held them in contempt for numerous remarks made in court and directed at the judge. The Supreme Court vacated the judgment, and remanded the case to be considered by a judge other than the one at whom the remarks were directed.

The court in *Mayberry* focused on two factors that compelled reversal. First, it pointed out that the judge had waited until the end of trial to adjudge the defendants in contempt.[23] Second, and most important, the court did not prohibit judges from sitting in judgment on contemptuous behavior that occurs before them; rather, it held that due process requires a new and impartial judge only where there is evidence that the trial judge "has become so 'personally embroiled' with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge." (*Id.* at p. 465 [27 L.Ed.2d at p. 540].)[24]

In the case at bench, unlike *Mayberry,* the trial court did not wait to adjudge petitioner in contempt, but immediately cited him and soon thereafter signed the order of commitment. ▮ More importantly, from our review of the instant record, we cannot say that the judge was so personally embroiled with petitioner that he was unfit to sit in judgment on the contempt charge. The attack here did not consist of "fighting words" which the court found in *Mayberry* carried such a potential for bias as to require disqualification. Petitioner's conduct, even though disrespectful, did not rise to the level of personal vilification which by itself would give evidence of the trial court's probable personal embroilment.[25]

Nor do statements made by the judge indicate that he was unfit to sit in judgment. (Contrast *Offutt* v. *United States* (1954) 348 U.S. 11, 16-17 [99 L.Ed. 11, 17-18, 75 S.Ct. 11].) For example, the judge's remark, cited by petitioner, that "I didn't know you went on forever," made after an inter-

---

[23]"Where, however, he does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place." (*Mayberry* v. *Pennsylvania, supra,* 400 U.S. at pp. 463-464 [27 L.Ed.2d at p. 539].)

[24]"It is, of course, not every attack on a judge that disqualifies him from sitting. In *Ungar* v. *Sarafite,* 376 U.S. 575, we ruled that a lawyer's challenge, though 'disruptive, recalcitrant and disagreeable commentary,' was still not 'an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification.' *Id.,* at 584. Many of the words leveled at the judge in the instant case were highly personal aspersions, even 'fighting words'—'dirty sonofabitch,' 'dirty tyrannical old dog.' 'stumbling dog,' and 'fool.' He was charged with running a Spanish Inquisition and told to 'Go to hell' and 'Keep your mouth shut.' Insults of that kind are apt to strike 'at the most vulnerable and human qualities of a judge's temperament.' *Bloom* v. *Illinois,* 391 U.S. 194, 202." (*Id.* at pp. 465-466 [27 L.Ed.2d at p. 540].)

[25]See *Weiss* v. *Burr, supra,* 484 F.2d at page 982 (insulting remarks concerning the court's ruling; judge held not personally embroiled); *In re Grossman, supra,* 24 Cal.App.3d at pp. 632-633 (insulting remarks; judge held not personally embroiled). But see *United States* v. *Meyer* (1972) 462 F.2d 827 [149 App.D.C. 212] (accusation by attorney that the judge had made up his mind on the case before entering the courtroom held "sufficiently personal to invoke the *Mayberry* doctrine." (*Id.* at p. 844.)).

ruption of petitioner's argument, may demonstrate impatience but certainly not personal embroilment. Similarly, the judge's remarks that "I cannot attribute [the delay on petitioner's part] to anything except the cunning, shrewd and deliberate attempt to thwart me," appear to represent an accurate picture of petitioner's conduct, rather than an example of bias.

More difficult, however, is the disposition of petitioner's assertion that the judge demonstrated his personal involvement by totally misconstruing petitioner's attempt to apologize. As previously noted, the day after petitioner was cited for contempt, he apologized to the judge for the remarks in question. (See. fn. 7, *ante*.) The judge, upon reflection, construed this apology as a further affront to his integrity, since it implied that he knew the law and wilfully disobeyed it. (See fn. 8, *ante*.)

We have held that in instances of direct contempt an apology to the judge should be given serious consideration. (*People* v. *Turner* (1850) 1 Cal. 152, 153.)[26] The effect to be given to such a mitigating factor lies exclusively in the sound discretion of the trial judge. (*Lyons* v. *Superior Court, supra,* 43 Cal.2d at p. 763; *City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509, 520 [241 P.2d 243]; *In re Friday, supra,* 138 Cal.App. at p. 664.)

While the trial judge appears to have seriously considered petitioner's apology, it is arguable that he misinterpreted it.[27] Even if he did, we think that this is insufficient to establish that the judge was personally embroiled with petitioner. A useful comparison may be made with *Offutt* v. *United States, supra,* 348 U.S. 11, in which the Supreme Court reversed a contempt adjudication made by a federal judge. Among other things, the judge made the following statements in discharging the jury at the end of the case: " 'I also realize that you had a difficult and a disagreeable task

---

[26]"A judge should bear in mind that he is engaged, not so much in vindicating his own character, as in promoting the respect due to the administration of the laws; and this consideration should induce him to receive as satisfactory any reasonable apology for an offender's conduct." See also *Lyons* v. *Superior Court* (1955) 43 Cal.2d 755, 763 [278 P.2d 681]: "Likewise, even where the finding of contempt appears essential to the proper conduct of the court's business no class of offense occurs to us in which the court should more readily search out and give effect to mitigating circumstances than in cases of direct contempts."

[27]Our intuition must be tempered by the realization that we are forced to depend upon a record which fails to convey the full circumstances surrounding the apology. "A contempt holding depends in a very special way on the setting, and such elusive factors as the tone of voice, the facial expressions, and the physical gestures of the contemner; these cannot be dealt with except on full ventilation of the facts. Those present often have a totally different impression of the events from what would appear even in a faithful transcript of the record." (*In re Little, supra,* 404 U.S. at p. 556 [30 L.Ed.2d at p. 711]; Burger, C. J., concurring.)

in this case. You have been compelled to sit through a disgraceful and disreputable performance on the part of a lawyer who is unworthy of being a member of the profession; and I, as a member of the legal profession, blush that we should have such a specimen in our midst.' " (*Id.* at p. 17, fn. 3 [99 L.Ed. at p. 17].) The Supreme Court concluded: "The record discloses not a rare flare-up, not a show of evanescent irritation—a modicum of quick temper that must be allowed even judges. The record is persuasive that instead of representing the impersonal authority of law, the trial judge permitted himself to become personally embroiled with the petitioner. There was an intermittently continuous wrangle on an unedifying level between the two. For one reason or another the judge failed to impose his moral authority upon the proceedings. His behavior precluded that atmosphere of austerity which should especially dominate a criminal trial and which is indispensable for an appropriate sense of responsibility on the part of court, counsel and jury." (*Id.*)

The record in this case fails to disclose any such vitriolic attack as that which the court directed against the attorney in *Offutt*. ▓▓▓ Nor is there any evidence that the judge abrogated his duty to impose his moral authority upon the proceedings. To the contrary, the record discloses considerable patience and control on the part of a judge faced with repeated impertinences of counsel. We conclude from the record before us that the trial judge was not required, as a matter of due process, to refer the matter of adjudication of the alleged contempt to another judge. (Cf. *Ungar* v. *Sarafite* (1964) 376 U.S. 575, 588 [11 L.Ed.2d 921, 930, 84 S.Ct. 841].)

III

Finally, petitioner contends that he has been denied the equal protection of the laws because California statutes do not provide for an appeal from, or for a stay of, an order adjudicating a person in contempt of court. The point of his argument is this: He assumes that "[t]he conviction . . . at issue . . . is a misdemeanor" (citing Pen. Code, § 166, subd. 1), but asserts that the court below "necessarily proceeded under the provisions of C.C.P. § 1209." ▓▓▓ Asserting that the right of appeal, if provided by the state, "must be fairly and equally available to all," petitioner argues that equal protection is denied him, since "[e]very convicted misdemeanant, except one convicted of contempt" obtains review by appeal. The contention is devoid of merit.

Petitioner was not convicted of violating Penal Code section 166 or any other section of the Penal Code. He was adjudged in direct contempt of court and his summary adjudication of contempt was proper under Code

of Civil Procedure section 1211.[28]　　　Although an order made in a contempt proceeding is not appealable (§ 1222; *John Breuner Co.* v. *Bryant, supra,* 36 Cal.2d at p. 878; *In re Circosta, supra,* 219 Cal.App.2d at p. 785), it may be reviewed by certiorari or, where appropriate, by habeas corpus (*John Breuner Co., supra; Circosta, supra*).　　　We have already outlined earlier in this opinion our scope of review and emphasized our responsibility to examine the record to the end of determining whether there is substantial evidence to support the judgment. These procedures afford petitioner the safeguard of a review of the proceedings below; he is not discriminated against merely because a conviction of criminal contempt under Penal Code section 166 may be reviewed by the usual appellate process.

The order to show cause is discharged and the petition for the writ is denied.

Wright, C. J., McComb, J., Burke, J., and Clark, J., concurred.

**MOSK, J.**—I dissent.

I begin by expressing sympathy for this able and considerate trial judge. Undoubtedly his patience was worn thin by what he believed, perhaps correctly, were the exasperating and dilatory tactics of petitioner attorney. As any judge with trial court experience realizes, there inevitably arises that one case in a thousand when the tensions of the argument and the overzealousness of counsel cause righteous anger to overcome normal tolerance and serenity.

If at that moment of humanly understandable rage the judge lashes out in response, the resultant contempt citation not infrequently fails to survive appellate review. That is the circumstance in the instant case. Analyzing the colloquy involved here, I would characterize it precisely as Justice Oliver Wendell Holmes, in his dissent, reacted to the newspaper articles involved in *Toledo Newspaper Co.* v. *United States* (1918) 247 U.S. 402 [62 L.Ed. 1186, 38 S.Ct. 560]: "I confess that I cannot find in all this or in the evidence in the case anything that would have affected a mind of reasonable fortitude, and still less can I find there anything that obstructed

---

[28]Section 1211 states in relevant part: "When a contempt is committed in the immediate view and presence of the court, or of the judge at chambers, it may be punished summarily; for which an order must be made, reciting the facts as occurring in such immediate view and presence, adjudging that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed."

the administration of justice in any sense that I possibly can give to those words."

In the span of nearly a quarter of a century between 1948 and 1972 there have been innumerable cases involving contempt citations, most of them factually distinguishable, some affirming trial court rulings, some reversing. Of all the cases which can be cited, however, I find the most relevant and persuasive to have been decided in those two years.

Justice Traynor wrote the decision for this court in *Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784 [192 P.2d 905]. In that case three jurors complained to the trial judge that a Mrs. Hill approached them in the corridor of the courthouse during the course of a trial. The judge undertook to examine into this alleged interference with jurors and placed one after another on the stand in order to obtain the facts. Attorney Leo Gallagher appeared and indicated he represented Mrs. Hill. When his attempt to cross-examine the jurors was refused because the court indicated he had no "place in here" during a mere investigation, Gallagher demanded: "You want a fair investigation, don't you?" He repeated a second time: "But you want a fair investigation?" A third time he said: "I know that, but you want a fair investigation?" He reiterated once more: "Don't you want a fair investigation of this?" And finally, he undertook to interrogate the court, asking whether his client was under arrest and demanding: "Will you kindly answer that question, Judge, whether she is under arrest at this time? Won't you hear my argument?"

The trial court found that the statements had been made in a "loud, insolent, aggressive, belligerent, boisterous, harsh, offensive and contemptuous tone of voice and with a sneering and contemptuous expression on his face and a threatening demeanor toward said court and the judge thereof and in disobedience of the lawful orders of the court, and in a disorderly and insolent manner toward the judge of said court." The court further found that the conduct "did interrupt the due course of said trial and did obstruct the administration of justice and interfere with the orderly proceedings of the court."

Despite the foregoing fulsome finding, much more pejorative in description than that in the instant order, this court found that there was "nothing contemptuous in petitioner's words and nothing in the record to show that his conduct tended to interrupt the due course of the examination," and that petitioner was merely an attorney who had been "regularly and faithfully representing the interests of his client."

In his opinion in *Gallagher* Justice Traynor pointed out: "Another consideration is the fundamental interest of the public in maintaining an independent bar. Attorneys must be given a substantial freedom of expression in representing their clients. 'An advocate is at liberty, when addressing the Court in regular course, to combat and contest strongly any adverse views of the Judge or Judges expressed on the case during its argument, to object to and protest against any course which the Judge may take and which the advocate thinks irregular or detrimental to the interests of his client, and to caution juries against any interference by the Judge with their functions, or with the advocate when addressing them, or against any strong view adverse to his client expressed by the presiding Judge upon the facts of a case before the verdict of the jury thereon. An advocate ought to be allowed freedom and latitude both in speech and in the conduct of his client's case.' (Oswald, Contempt of Court (3d ed.), pp. 56-57. See, *People* v. *Rongetti,* 344 Ill. 107, 122 [176 N.E. 292].) The public interest in an independent bar would be subverted if judges were allowed to punish attorneys summarily for contempt on purely subjective reactions to their conduct or statements.

"An attorney has the duty to protect the interests of his client. He has a right to press legitimate argument and to protest an erroneous ruling. . . . The heat of courtroom debate, particularly where liberty is concerned, often gives rise to persistence on the part of counsel." (*Id.* at pp. 795-796, 797.) To the same effect is *Raiden* v. *Superior Court* (1949) 34 Cal.2d 83 [206 P.2d 1081], in which a contempt citation was annulled where the attorney asserted the trial judge's order "defeated the ends of justice."

Gallagher's persistent inquiries about a fair investigation undeniably implied that the court was conducting an unfair investigation; yet he was exonerated. His comment was remarkably comparable to petitioner's statement in the instant case that "This court obviously doesn't want to apply the law," a similar implication that the court was conducting an unfair trial.

In 1972 the United States Supreme Court decided *In re Little,* 404 U.S. 553 [30 L.Ed.2d 708, 92 S.Ct. 659]. While the precise words are not given in the text of the opinion, the Supreme Court found "Petitioner made statements that the court was biased and had prejudged the case." The trial court's order recited that the court felt " '[T]hese remarks were very disrespectful and tended to subvert and prevent justice . . . that they reflected on the integrity of the Court and tended to subvert and prevent justice.' " (*Id.* at p. 554 [30 L.Ed.2d at p. 710].)

The high court found that the petitioner, acting in pro. per. as his own counsel, was entitled to latitude in conducting his defense and in vigorously espousing his cause. The court cited *Craig* v. *Harney* (1947) 331 U.S. 367, 376 [91 L.Ed. 1546, 1552, 67 S.Ct. 1249], that the "law of contempt is not made for the protection of judges who may be sensitive . . . . Judges are supposed to be men of fortitude, able to thrive in a hardy climate." The court also recalled the words of caution in *Brown* v. *United States* (1958) 356 U.S. 148, 153 [2 L.Ed.2d 589, 596, 78 S.Ct. 622, 72 A.L.R.2d 818], that trial courts "must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice."

The allegations of Little that his trial court was biased and had prejudged the case are far more damning of the judge and the judicial process than the remark of this petitioner that the court did not want to apply the law.

The majority make the heroic declaration that petitioner's statement about the court not wanting to apply the law "was contemptuous on its face" (*ante,* .pp. 250 and 254-255). I must respectfully disagree. There are, on occasions, perfectly valid reasons for a court to decline "to apply the law." The judge may believe "the law" has in effect been overruled, that it is anachronistic and no longer relevant or enforceable, that it violates contemporary constitutional principles, that it is oppressive or discriminatory in application. I do not suggest this petitioner had such reservations in mind. Nevertheless I do not believe we can, *ipse dixit,* declare petitioner's bare words to be opprobrious, demeaning or contemptuous per se. In short, there are many tolerable interpretations of those precise words.

Since the words are not actionable per se, the fundamental question here is whether the petitioner was, by virtue of that utterance and in the context in which it was said, guilty of disrupting or obstructing the judicial process. I do not believe he was.

First, the colloquy occurred outside the presence of the jury. Thus it could have no influence upon the trier of fact, and did not affect the course of justice in the fact-finding process.

Second, the demand of petitioner to pursue discovery through the person of the prosecutor, though perhaps overly dramatic, was not wholly untenable in the light of this court's decision in *In re Ferguson* (1971) 5 Cal.3d 525 [96 Cal.Rptr. 594, 487 P.2d 1234]. He was entitled to argue the point earnestly.

Third, nothing in the record before us reflects any unusual tone of voice, or boisterous or menacing conduct by the petitioner. In this respect the

order of the trial court is less supportable than that which we reversed in *Gallagher.*

Fourth, while the trial court stated in the contempt order that the statement "tended to interrupt the due course of the trial then in progress" the court fails to describe how a mere one-sentence *statement*, in the context of a discussion, albeit heated, over a point of law, and as distinguished from *conduct*, could in fact interrupt the proceedings. The entire episode was concluded in a matter of seconds, and it did not in actuality interrupt, disturb, delay, or in any manner affect the trial or its result.

Finally, I find it impossible to interpret petitioner's apology, rendered after overnight contemplation, as confirming or aggravating the purported contempt. I fail to discern anything in the words of counsel other than a modest effort to express contrition for having offended the court. For the trial judge to perceive in the attempted apology an exacerbation of the original offense suggests, as of that time, an unfortunate departure from judicial objectivity.

The apology issue was referred to in the most celebrated contempt case in California history, involving Stephen J. Field, found in the very first volume of California Reports (*People* v. *Turner* (1850) 1 Cal. 152). Justice Bennett, one of the original three justices of the Supreme Court, wrote (at p. 153): "The power thus vested in a court is necessarily of an arbitrary nature, and should be used with great prudence and caution. A judge should bear in mind that he is engaged, not so much in vindicating his own character, as in promoting the respect due to the administration of the laws; and this consideration should induce him to receive as satisfactory any reasonable apology for an offender's conduct." (See Mosk, *Direct Contempt* (1956) 31 State Bar J. 510, 523.)

There is no doubt that a trial court must deal with both obstruction and disruption of a trial by therapeutic use of the contempt power. Where nothing more than disrespect or discourtesy is involved, however, the dangers of abuse of the contempt power generally outweigh the benefits of using that weapon. The readiness of some judges to find contempt in conduct susceptible of various interpretations, and the capacity of others to provoke an unseemly response by their own imperious behavior on the bench, suggest the dangers of abuse. It must be emphasized that mere personal insult or irritating conduct should not be confused with legally contemptuous behavior. The nature of the trial as constructive human effort to reach a just result must be preserved and enhanced, and no person, whatever his role, should create by his conduct an atmosphere that makes

this impossible. But personal discourtesy, even insult, is on a relatively trivial plane in the whole scheme of things, and a certain amount should be tolerated when it falls short of actually interfering with the proceedings of the trial. (Note, *Contempt of Court* (1971) 56 Cornell L.Rev. 183, 208.)

Some opinions speak of contempt in terms of lessening the dignity of the court. (See, e.g., *People* v. *Gholson* (1952) 412 Ill. 294 [106 N.E.2d 333, 335].) On that subject Professor Max Radin said: "Judicial dignity is an important element of our system and serves a real legal function." But, he added, "It is, however, not a legal duty to be well mannered and it may even be said that it would be unconstitutional to make it one. . . . [T]here is no reason why the dignity of the court should take such dimensions or assume such a character that it demands awe or veneration." (Radin, *Freedom of Speech and Contempt of Court* (1942) 36 Ill.L.Rev. 599, 610.)

I would issue the writ.

Tobriner, J., concurred.

Petitioner's application for a rehearing was denied November 28, 1973. Tobriner, J., and Mosk, J., were of the opinion that the application should be granted.