[No. G015559. Fourth Dist., Div. Three. June 30, 1994.]

NADINE BETSWORTH, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, Respondent.

## COUNSEL

Jennifer L. Keller for Petitioner.

Thomas J. McBirnie for Respondent.

## Opinion

SILLS, P. J.—

### Introduction

"Fair trials," wrote Hugo Black, "are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer." (*In re Murchison* (1955) 349 U.S. 133, 137 [99 L.Ed. 942, 947, 75 S.Ct. 623].) One does not need to go to law school to know, as Black wrote in the same opinion, that ". . . no man can be a judge in his own case." (*Id.* at p. 136 [99 L.Ed. at p. 946].)

The area of the law where judges are most likely to end up presiding over their own cases is contempt of court, where they will be both prosecutor and judge. The justification is practical necessity. Judges must act swiftly to protect court proceedings from disruption or one party's attempt to gain an unfair advantage (see e.g., *Codispoti* v. *Pennsylvania* (1974) 418 U.S. 506, 513 [41 L.Ed.2d 912, 920, 94 S.Ct. 2687] [summary contempt power based on need to protect the "integrity of the trial process in the face of an 'actual obstruction of justice' "]), and there may not be enough time to send for another judge to conduct a minitrial on every such disruption or attempt.

On the other hand, not every contempt of court strikes at the *process* of justice. The kind of conduct which is most popularly associated with contempt of court—disrespect or discourteous behavior toward a judge—sometimes does not disrupt court proceedings or require instant action. The judge may *wait* to deal with the disrespect until the end of the trial, or even later.

But this time lag brings us back to the judge-in-your-own-cause problem. The pressing necessity to act summarily as both prosecutor and judge is gone because there is no ongoing process to protect. (See *Taylor* v. *Hayes* (1974) 418 U.S. 488, 497 [41 L.Ed.2d 897, 907, 94 S.Ct. 2697] ["The usual justification of necessity . . . is not nearly so cogent when final adjudication and sentence are postponed until after trial."].) Hence the rule is that where judges postpone adjudication of contempts based on *personal disrespect* until after trial, they should arrange for another judge to hear the matter if they are so personally embroiled that their perspective is affected. As William Douglas wrote in *Mayberry* v. *Pennsylvania* (1971) 400 U.S. 455, 463-464 [27 L.Ed.2d 532, 539, 91 S.Ct. 499], where a judge "does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place."

The instant case centers on a workers' compensation referee who ignored the admonition in *Mayberry* and acted as judge and prosecutor in a proceeding held *four months* after the alleged contempt. The contempt was based on a comment allegedly made by an attorney—who denied making it—in a hearing where the referee had previously refused the attorney's request for a court reporter. As we now explain, because the referee became personally embroiled in the affair—even to the extent of complaining both to the attorney's *employer and client* about the alleged incident—the subsequent judgment of contempt must be annulled.

FACTS

Phillip Holland, a resident of Riverside County, first filed an application for workers' compensation benefits in November 1991 in the San Bernardino district office of the Workers' Compensation Appeals Board (the Board). (There is no district office in Riverside County.) The application was based on an injury allegedly sustained while working as a residential counselor for Mt. Jurupa Boys' Home. The application was dismissed by a settlement conference referee in December 1991. Holland then switched lawyers, who refiled his application in the Anaheim district office of the Board, and at the same time filed two additional applications based on injuries which allegedly occurred while Holland was working for the County of Riverside as a social worker. The new lawyers selected the Anaheim office because their own office is in the same building.[1]

The county objected to the new venue, which, under the workers' compensation venue statute, meant that venue was in the district office nearest the workers' residence on the date of filing or nearest the place where the injury allegedly occurred.[2] The county reiterated its objection in a formal petition to transfer venue to San Bernardino, which was set to coincide with

[1]Labor Code section 5501.5, subdivision (a) lists three possible venues for workers' compensation claims: (1) where the worker resides, (2) in the county where the injury (or last injurious exposure) occurred, or (3) in the county where the worker's *attorney* maintains his or her principal place of business.

The Anaheim venue selection was quite convenient indeed for Holland's new attorneys. At the contempt hearing one of them would testify that "sometimes" he will see a certain referee in the bathroom of the building and talk to him about interesting cases, albeit "obviously" not about cases that "would ever be on his calendar."

[2]Labor Code section 5501.5, subdivision (c) provides that if venue is chosen based on the attorney's office, the employer shall have 30 days from the receipt of the information request form to object to the selected venue site, in which case venue is only proper in the worker's county of residence or where the injury occurred. Subdivision (d) of section 5501.5 provides that if there is no appeals board office in the county where venue is permitted under subdivision (a) (see fn. 1, *ante*), the application shall be filed at the appeals board office nearest the worker's residence, or nearest the place of injury, or nearest the worker's attorney's office "unless the employer objects under subdivision (c)."

a mandatory settlement conference on May 20, 1993. Holland's attorneys filed no opposition to the petition. The workers' compensation judge,[3] however, refused to allow the matter to be considered on the record. The judge scheduled trial for August 10, 1993, at 9 a.m.

Within 10 days of the refusal to consider its venue objection, Riverside County filed a petition with the Board in San Francisco seeking reconsideration. On August 4—less than a week prior to the scheduled trial—the Board issued a written opinion. While the Board dismissed the petition for reconsideration (because the workers' compensation judge refused to rule in the first place, there was no order to *reconsider*), the Board noted that the workers' compensation judge had failed to consider a matter which had been "properly raised" and stated that the presiding workers' compensation "judge" (who was now, as we have explained in footnote 3, the presiding workers' compensation "referee") should make a determination of venue at the outset of the case when the issue is first raised. The Board also noted that the "deferral of the issue of venue until trial fails to give effect to the venue requirements [of the statute], as the matter will either have become moot or will require additional delay."

---

[3]Workers' compensation hearing officers are employees of the California Division of Workers' Compensation who are required to be attorneys and members of the State Bar. As part of a series of workers' compensation reforms, Labor Code section 27 was amended, effective July 16, 1993, to provide that the term "workers' compensation judge" means "workers' compensation referee." (Stats. 1993, ch. 121, § 12.) There is some indication that the change was intended to be symbolic. (See *Special Report, Legislature Says: "Judge Means Referee." Now What?* (1993) 21 Cal. Workers' Comp. Rptr. 309 [quoting bill's author, Senator Bill Leonard, as saying "They are not judges. They are not appointed by the governor. . . . They are like traffic referees. . . . I wanted them to have a title that was more fitting and reflected their true accountability."].)

As we write, Senate Bill No. 1945 (1993-1994 Reg. Sess.), which is intended to restore the title of "judge" to persons who hear and rule on workers' compensation claims, is currently winding its way through the Legislature, but has not yet been passed. Senate Bill No. 1945 appears to be equally symbolic as the recent change to Labor Code section 26. (See Sen. Rules Com. Rep. for hearing on Sen. Bill No. 1945 set for May 16, 1994 [noting "[p]roponents argue that it is appropriate for members of the administrative judiciary to have titles commensurate with and reflective of their status and function"].)

The change to Labor Code section 27, of course, presents a small problem in describing the facts of this case. The officer who refused to hear Riverside County's venue challenge was a workers' compensation *judge* at the time. A few months later, he and his fellow officers were *referees*. To use "judge" consistently in our description would be to ignore Labor Code section 27 as it now reads; to use "referee" when referring to a workers' compensation hearing officer prior to July 16, 1993, would be to ignore Labor Code section 27 as it then read. The problem is compounded because the use of the term "referee"—after the recent reform legislation had become effective—is itself one of the issues in the events leading to this writ proceeding.

Our solution is to use the term which is or was correct at the time, or, when the context demands it (e.g., a clerk telling an attorney to "go see Judge Flynn"), the generic term "officer."

Riverside County's attorney, Nadine Betsworth, phoned the clerk of the Anaheim district office on August 9 to see if the trial date had been vacated; she was told it had not, but the clerks would check into the matter and perhaps they would have more information the next morning.

On August 10, 1993, Betsworth arrived half an hour early and was told by the clerk that the presiding officer, Ellen Flynn, would handle the venue matter personally. As the attorneys on the case arrived they were instructed to see the presiding officer on the venue matter in courtroom 1. After 9 a.m. the attorneys stood in line and waited another 30 minutes until they approached the bench. Betsworth asked for a court reporter. Referee Flynn stated she did not have to provide one and was not going to.[4] Betsworth also "insisted"[5] she was entitled to an evidentiary hearing. Referee Flynn denied that request.

At this point (though the record is not exactly clear) Betsworth became upset and addressed Referee Flynn as "Madam Referee."[6] The words, according to one of her fellow attorneys, were said in an "agitated" tone of voice and "possibly a little louder than . . . normal."[7] Referee Flynn became angry, and stated the comment was "inappropriate," that she was the "presiding judge and she expected to be addressed as such."

At some point during the discussion before the bench (again the record is not clear), Betsworth requested a change in venue, and there was no argument against her request. Referee Flynn ruled that the case would stay in Anaheim. She ignored Betsworth's request for more time to appeal the order.

The attorneys were then ordered by Referee Flynn to trial in another courtroom. The applicant's attorney would later testify that Betsworth then said she "basically could not get a fair hearing on [the venue] issue. She said she could see there was favoritism being shown to [the applicant's attorney's] law firm." (In various declarations prior to the later contempt hearing, Betsworth denied ever using the words "fair hearing.") Another version of

---

[4]Because Referee Flynn denied the request for a reporter, there is, of course, no transcript of what happened. The record before us, however, includes a reporter's transcript of the subsequent contempt hearing against Betsworth in which Referee Flynn acted as both judge and prosecutor, asking questions of the other attorneys who appeared before her on August 10.

[5]See footnote 4, *ante*; the characterization is that of an insurer's attorney in the case at the contempt hearing.

[6]The testimony of the insurer's attorney at the contempt hearing was contradictory as to whether the comment was made before or after the denial of the request for an evidentiary hearing.

[7]There was no testimony at the contempt hearing that words were uttered sarcastically. Of course, even "Your Honor" can be contemptuous if said with a deliberate sneer.

Betsworth's remarks had her saying, "Well, this obviously is another case of favoritism." As the attorneys were heading out the doorway Betsworth said, "this [is] another case that should be referred to the L.A. Times."

About an hour and a half later Referee Flynn handed the attorneys, who were waiting outside the courtroom, a copy of her decision denying Riverside County's venue request and told Betsworth her behavior was contemptuous. "If you call me Madam Referee again I will hold you in contempt." Referee Flynn's written decision essentially reasoned that Riverside County had no standing to object to an Anaheim venue because it was not a defendant on the "San Bernardino file."[8] The case proceeded to trial in another court where it was continued to September 24, 1993.

The next day, August 11, Referee Flynn telephoned Stephen J. Serembe, a partner at the law firm where Betsworth was employed as an associate. The exact language of the conversation is in dispute. According to a letter subsequently written to Referee Flynn by another partner in the firm, John H. Bolson, Referee Flynn expressed displeasure with Betsworth's conduct, and requested that Serembe or other partners in the firm meet with her in her offices in Anaheim "to discuss what occurred."[9] Bolson also stated he did not feel "comfortable with having an ex parte, off the record meeting" in her chambers "on a matter which is still pending before the Appeals Board," nor did he feel he should attempt to respond to a "verbal communication concerning the conduct of Attorney Betsworth." He "respectfully request-[ed]" a written statement of "any allegations involving Ms. Betsworth."

Referee Flynn's response, dated August 13, asserted the purpose of the meeting was "not to discuss the case" but to "discuss Ms. Betsworth's rude and disrespectful conduct not only to me, but to two secretaries who tried to assist her on 08/09/93 as well as our calendar clerk who tried to assist her on 08/10/93 . . . . [¶] The purpose of the meeting was to discuss what you intend to do to alleviate the problem." Referee Flynn sent a copy of her letter to Sharon K. Duncan of the Workers' Compensation Division of the County

---

[8]Here is the complete text of the decision: "Having considered the Motion of defendant for the County of Riverside and the contents of their Petition for Removal as well as the decision of the Workers' Compensation Appeals Board after granting the Petition for Removal and as the injured worker resides in Riverside and the injury occured in Baldwin Park and Riverside for which there is no office of the Workers' Compensation Appeals Board and as the attorney for the injured worker has selected the Anaheim office for venue purposes and as defendant, Golden Eagle [the insurer for the boys' home] who is the only defendant on the San Bernardino file, has no objection to the case proceeding in Anaheim and [¶] GOOD CAUSE APPEARING THEREFORE [¶] IT IS HEREBY ORDERED that the defendant's Motion for Change of Venue is denied."

[9]Bolson replied instead of Serembe because Bolson had been in charge of handling matters for Riverside County, one of the firm's clients, for many years.

of Riverside.[10] She did not reply to Bolson's request for a written statement of the allegations against Betsworth.

About a week later, on August 18, Betsworth filed a petition for removal of Referee Flynn or reconsideration of her order denying the venue change. The petition charged that Referee Flynn had engaged in a "blatant and arrogant attempt" to circumvent the Board's August 4 order requiring consideration of the venue question.

On September 9, while the petition was pending, Referee Flynn issued a formal accusation, citation and order to show cause regarding contempt against Betsworth, setting September 24 for a hearing. The accusation set forth three charges:

(1) "After issuing my ruling with regard to the Motion for Change of Venue, Ms. Betsworth addressed the undersigned as 'Madame Referee' rather than with the proper title of 'Judge' and did so in a surly, disrespectful and contemptuous manner."

(2) "She further stated that she could not get a fair hearing in from [sic] of the undersigned. This too, was stated in a disrespectful and contemptuous manner."

(3) "Upon information and belief, the following contemptuous conduct occurred. After the undersigned left the room, Ms. Betsworth further stated to all the litigants in the room, that she wished the Los Angeles Time [sic] were present to witness her motion for Change of Venue."

On September 14, Betsworth filed her opposition to the contempt charge, accompanied by a declaration in which she denied making the "fair hearing" comment. (She admitted using the phrase "Madame Referee," noting the recent change in the law regarding the title of workers' compensation hearing officers,[11] and argued that the Los Angeles Times reference was not made in Referee Flynn's presence.)

Because of the petition for reconsideration or removal, the Board requested the contempt hearing be postponed pending its ruling. In the meantime Referee Flynn filed a response on September 24.

In her response Referee Flynn addressed the subject of her phone call to Betsworth's employers. "The sole purpose of the conversation was to set up

[10]Bolson's letter had included Duncan on the courtesy copy list. The natural inference is that Duncan is an in-house attorney or officer who is responsible for referring workers' compensation cases to outside counsel.

[11]See footnote 3, ante.

a meeting to discuss the abusive behavior which had nothing to do with the case-in-chief. [] Instead of cooperating with the idea of setting up a meeting so that the abusive behavior could be discussed, Mr. Bolson of the firm wrote a letter accusing this Trial Judge of engaging in *ex parte* conversation on the case." Then she asserted that "[i]f a meeting had taken place and if Ms. Betsworth had apologized for her contemptuous conduct as well as her rude and abusive conduct to the court personnel, certainly the contempt matter would not have been pursued." Finally, Referee Flynn stated that she did not issue the formal accusation until September 8 because her last day of work before vacation was August 13, and even though the document was prepared at that time, her secretary "accidentally" did not type it until she returned to her office on September 8.

Referee Flynn acknowledged that the "Los Angeles Times" statement was not a direct contempt—that is, one made in her presence—but said it was added to the formal accusation to show Betsworth's "course of conduct." A reply declaration filed by Betsworth about a week later reiterated her denial of the "fair hearing" comment.

The Board in San Francisco denied the petition for removal on November 16. Referee Flynn set a hearing date of December 10 and sent a letter to the two other attorneys who appeared on the case on August 10 requesting they be present at the hearing. Both attorneys showed up.

Prior to questioning, Referee Flynn agreed to strike the "Los Angeles Times" allegation from the formal accusation as a "separate count of contempt." She also stated that while Betsworth had failed to use the "proper title of judge" and had used "Madam Referee" in a "surly, disrespectful, and contemptuous manner," that too would not be "pursued as a separate count of contempt" because Betsworth had not been warned about it beforehand. The referee did not, however, grant Betsworth's request for a "neutral arbiter." She said that by denying the petition for removal, the Board had "referred the matter back to me to try."

Referee Flynn then called the two attorneys and asked them questions directly from the bench. Betsworth's attorney was not allowed to ask any questions of Referee Flynn. At the conclusion Referee Flynn gave Betsworth's attorney the opportunity to submit a written final argument, which she accepted.

On January 21, 1994, after receiving the written final argument, Referee Flynn issued a judgment of contempt and order based solely on the "fair hearing" statement. She fined Betsworth $1,000, payable to the Board within

30 days. About a month later, on February 23, Betsworth filed a petition with this court requesting that we annul the order. We immediately issued an order staying the judgment of contempt and order directing the payment of the $1,000 fine and invited the Board to reply informally by March 14. In its informal reply, the Board acknowledges that a petition for reconsideration is not a prerequisite to our review. (*Rowen* v. *Workers' Comp. Appeals Bd.* (1981) 119 Cal.App.3d 633, 637 [174 Cal.Rptr. 185]; *Marcus* v. *Workmen's Comp. Appeals Bd.* (1973) 35 Cal.App.3d 598, 601, fn. 3 [111 Cal.Rptr. 101].) Nevertheless, the Board (perhaps a little bit wistfully) indicates it might have preferred the opportunity to review Referee Flynn's contempt order itself. It then briefly addressed the contentions set forth in the petition.

We set an order to show cause why the judgment of contempt should not be annulled, indicating that a formal return should be filed by April 25. The Board has not filed any formal return and, therefore, has admitted the truth of Betsworth's allegations. (E.g., *Rodriguez* v. *Municipal Court* (1972) 25 Cal.App.3d 521, 526 [102 Cal.Rptr. 45].) Even so, our statement of facts is based on the exhibits supporting the petition and the transcript of the contempt hearing rather than taking the allegations in the petition at face value.

## DISCUSSION

 Among several reasons Betsworth proffers for annulling the judgment of contempt is Referee Flynn's dual role as prosecutor and judge in a proceeding held four months after the allegedly contemptuous remark was made. This reason is particularly meritorious and obviates the need to address the balance of her arguments.[12] In a word, Betsworth was denied due process by being tried and sentenced by the same judicial officer who prosecuted her.

---

[12]With one exception: Relying on *In re Foote* (1888) 76 Cal. 543 [18 P. 678], Betsworth argues that the very fact of the delay from the time of the contempt (Aug. 10) to the date of the accusation (Sept. 9) deprived the Board of *jurisdiction* to hold her in contempt. Not so.

*Foote* is a one-paragraph opinion which basically says, without elucidation, that where a court does nothing to punish the contemnor at the time of the contempt, nor takes any steps to "retain jurisdiction," and no proceedings are taken until fifty days later, the court loses jurisdiction. As later explained by *Lamberson* v. *Superior Court of Tulare County* (1907) 151 Cal. 458, 450 [91 P. 100], *Foote* is a "laches" case. According to *Lamberson,* the trial court in *Foote* had "by its laches" lost jurisdiction. Here there was no laches. Referee Flynn was "on" Betsworth's "case" from day two (the telephone call to the law firm) if not day one (the admonition while the attorneys were waiting outside the courtroom). That is a sharp contrast to the 50 days of total inactivity in *Foote*.

More importantly, there was no loss of jurisdiction because, unlike *Foote,* the underlying trial had not yet been completed at the time of the contempt accusation, which was issued on September 9, *prior* to the resumption of trial on September 24. Indeed, the contempt hearing was originally set for the day trial woud resume. It is well established that the prosecution of a contempt may be deferred until the completion of the underlying trial without loss of

■ As alluded to in the introduction to this opinion, there is an important distinction between contempts which disrupt the judicial process (e.g., not obeying a directive to avoid asking witnesses certain questions) and those which reflect a personal animus toward the judge (e.g., telling the judge he or she is stupid or biased).[13] The former typically entails an attempt by one party to gain an unfair advantage. (See generally, *DeGeorge* v. *Superior Court* (1974) 40 Cal.App.3d 305, 312-313 [114 Cal.Rptr. 860].) Like the British in the Napoleonic wars, intervention is necessary to restore the balance of power. The judge has an obligation to swiftly punish those who attempt to win by disobeying the rules. As the court in *DeGeorge* put it, "The end of winning cannot justify the means of illegal and unfair advantage lest the system be perverted." (*Id.* at p. 313.)

Personal disrespect toward the judge is a different matter. While discourteous conduct may be no less contemptuous than, say, refusing to discontinue a forbidden line of questioning, personal feelings and bruised egos come into play. (See *Bloom* v. *State of Illinois* (1968) 391 U.S. 194, 202 [20 L.Ed.2d 522, 529, 88 S.Ct. 1477] ["Contemptuous conduct, though a public wrong, often strikes at the most vulnerable and human qualities of a judge's temperament."].) To prevent the power to punish committed to the judge from becoming an "instrument of oppression," he or she should be "long of fuse and somewhat thick of skin." (*DeGeorge* v. *Superior Court, supra,* 40 Cal.App.3d at p. 312, citing *Gallagher* v. *Municipal Court* (1948) 31 Cal.2d 784, 795 [192 P.2d 905].)

In specific terms, if a contempt is based on personal disrespect and the judge becomes personally embroiled in that disrespect, due process requires that the judge should arrange for another judge to adjudicate the contempt. (*Taylor* v. *Hayes, supra,* 418 U.S. 488, 501 [41 L.Ed.2d 897, 909] [requiring that a new judge should hear any retrial where first judge "did become embroiled in a running controversy" with criminal defense counsel]; *Mayberry* v. *Pennsylvania, supra,* 400 U.S. 455, 464 [27 L.Ed.2d 532, 539-540] [numerous vilifications by in propria persona defendant of trial judge embroiled judge in the adjudication of the contempt and required another judge to hear contempt charges]; *Offutt* v. *United States* (1954) 348 U.S. 11, 17-18 [99 L.Ed. 11, 17-18, 75 S.Ct. 11] [directions to sentencing judge to assign another judge where sentencing judge "permitted himself" to become involved in a "continuous wrangle on an unedifying level" between himself

jurisdiction (*People* v. *Fusaro* (1971) 18 Cal.App.3d 877, 888 [96 Cal.Rptr. 368], disapproved on another point in *People* v. *Brigham* (1979) 25 Cal.3d 283, 292, fn. 14 [157 Cal.Rptr. 905, 599 P.2d 100]; see also *In re Application of Grossman* (1930) 109 Cal.App. 625, 631-632 [293 P. 683].) A fortiori there is no loss of jurisdiction if the trial judge (or hearing officer with contempt powers) acts prior to completion.

[13]In this context we use the term "judge" in its most generic sense to include all judicial officers who might have occasion to adjudicate a contempt.

and criminal defense attorney]; *In re Karagozian* (1975) 44 Cal.App.3d 516, 524 [118 Cal.Rptr. 793] [directions that retrial should be by another judge where deputy public defender had been "very obnoxious" toward first judge]; see also *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901-903 [97 Cal.Rptr. 158] [due process precluded referee from acting as both prosecuting attorney and judge in juvenile delinquency proceeding].) The rule has been recognized by our Supreme Court in *In re Buckley* (1973) 10 Cal.3d 237, 255-258 [110 Cal.Rptr. 121, 514 P.2d 1201, 68 A.L.R.3d 248], but was not applied there because the record failed to show personal embroilment.

 In the instant case, there is no question that the alleged contempt was directed at Referee Flynn *personally* rather than at the process of justice. Indeed, few cases could be more clear cut in this regard. There was no ongoing trial to disrupt, no jury to prejudice. Referee Flynn had made her ruling; the attorneys were about to leave or in the process of leaving. The key question is whether the record reflects sufficient personal embroilment on Referee Flynn's part to require assignment of the subsequent hearing to another officer.

There is some suggestion in the cases that if a contemnor heaps enough personal vituperation on a judge, the judge is automatically personally embroiled in the contempt. In *Taylor* v. *Hayes, supra,* 418 U.S. at page 501 [41 L.Ed.2d at page 909], the court noted that a criminal defense attorney's "conduct did not constitute the kind of personal attack on [the judge] that, regardless of his reaction or lack of it, he would be '[un]likely to maintain that calm detachment necessary for fair adjudication.'" This point was reiterated in *Hawk* v. *Superior Court* (1974) 42 Cal.App.3d 108, 132 [116 Cal.Rptr. 713], which also stated that the accused's conduct was not the "kind of personal attack" that makes it unlikely the judge should have removed himself "regardless" of his personal "reaction" to it. While the idea of rewarding a contemnor with a new judge for an especially vicious personal attack—at least where the judge forebears from punishing the contempt then and there—is unsettling (see *Mayberry* v. *Pennsylvania, supra,* 400 U.S. 455, 463 [27 L.Ed.2d 532, 539] [". . . we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case."]), we need not resolve whatever tension there may be in the law on the point. Betsworth's "fair hearing" comment was not the sort of vicious attack that *Taylor* and Hawk arguably imply requires another judge when contempt proceedings are postponed.

Even so, as the court in *Taylor* pointed out, though contemptuous conduct may fall "short of a personal attack," the judge may become so embroiled

that he or she cannot "hold the balance between vindicating the interests of the court and the interests of the accused." (*Taylor* v. *Hayes, supra,* 418 U.S. at p. 501 [41 L.Ed.2d at p. 909].) The facts here present a clear pattern of personal embroilment.

The pattern began outside the courtroom where the attorneys were waiting when Referee Flynn came up and admonished Betsworth about the "Madame Referee" comment. The semantic demotion clearly upset her personally, perhaps so much so that she failed to mention anything about the fair hearing comment.

The next day Referee Flynn telephoned the partners in Betsworth's law firm to ask of them, "what you intend to do to alleviate the problem." After one of those partners responded by delicately suggesting that an ex parte meeting perhaps might not be proper, Referee Flynn sent a letter referring to Betsworth's "rude and disrespectful conduct" not only to Betsworth's employer, but also sent a copy to the County of Riverside—her employer's regular client. While Referee Flynn's secretary may have unthinkingly included the Riverside County workers' compensation employee on the courtesy copy list, Referee Flynn should have known not to send a disparaging letter to the client of a law firm employing the attorney against whom she was in the process of bringing contempt charges. The import of unilaterally apprising one of the firm's clients of her displeasure with one of the firm's associates was unmistakable—particularly in light of the high likelihood that future workers' compensation claims against Riverside County would be filed in the Anaheim district office.

Referee Flynn then filed her formal accusation of contempt against Betsworth, but only after Betsworth had filed a petition requesting Referee Flynn's removal.[14] As Referee Flynn's declaration in opposition to that petition revealed, the contempt accusation was made in the express light of one of Betsworth's employers' failure to "cooperate" with the referee's telephone request for a special meeting, combined with personal umbrage at the thought that someone should even hint that Referee Flynn might be acting unwisely. "Instead of cooperating with the idea of setting up a meeting so that the abusive behavior could be discussed, Mr. Bolson of the firm wrote a letter accusing this Trial Judge of engaging in *ex parte* conversation on the case." The declaration made explicit the link between the proposed meeting, a hoped-for apology from Betsworth, and the subsequent prosecution for contempt.

---

[14]Referee Flynn declared that the accusation would have been filed earlier, but the secretary's "accident" in not typing it up before her vacation only shows that the referee had the benefit of additional time to reflect on the wisdom of filing the accusation in the first place.

These facts sharply contrast with those where courts have found insufficient embroilment to require another judge to hear the contempt. In *In re Buckley, supra,* 10 Cal.3d at pages 241-246, the judge acted at the time of the contempt after a criminal defense attorney, quite extraordinarily, called the prosecuting attorney to the stand as a witness and then unreasonably and obstinately refused to provide an offer of proof as to what the prosecutor might say. After the trial judge made it clear he was not going to allow such shenanigans, the criminal defense attorney remarked that the court "obviously" did not "want to apply the law." There was no injection of personal anger or offense on the part of the trial judge into the adjudication.

In *DeGeorge* v. *Superior Court, supra,* 40 Cal.App.3d at page 316, the case turned on the fact that the viable remaining contempts were "not directed at the judge personally." Had they been, the court opined the result would have been different. (*Ibid.* ["Had the judge's irritation been triggered by disrespect for the court involving 'fighting words' and had petitioner been adjudicated in contempt for that disrespect, the record might be construed as establishing that the judge was so personally embroiled as to be disqualified from acting on the contempt."].)

And in *Hawk,* which involved the well-publicized murder prosecution of Juan Corona, the trial judge, like the one in *Buckley,* dealt with each contempt in his chambers as it arose. (*Hawk* v. *Superior Court, supra,* 42 Cal.App.3d at p. 131.)

*McCann* v. *Municipal Court* (1990) 221 Cal.App.3d 527, 544 [270 Cal.Rptr. 640], relied upon by the Board in its informal reply (along with *Buckley*) does nothing to demonstrate that Referee Flynn was not personally embroiled in the matter. There, as in *Buckley,* nothing indicated the judge was acting upon a personal affront. Indeed, the court (in the single paragraph devoted to the embroilment issue) described the trial judge as "astonishingly cool and professional throughout." (*McCann, supra,* 221 Cal.App.3d at p. 544.)

"Astonishingly cool" hardly describes Referee Flynn's actions in this case. Indeed, the present case bears the hallmark of a vendetta extending several months, arising more out of personal indignation over a semantic demotion ("Madame Referee") than any imputation of judicial impartiality. Even if sending the letter to Duncan was an innocent mistake borne of rote secretarial letter processing, there was a pattern of embroilment that extended from unilaterally contacting Betworth's employer, to defending *that* action in a subsequent letter, to arranging for the appearance of what were,

in effect, the prosecution witnesses at the contempt hearing. These are hallmarks of a substantial personal investment in the case.

It makes no difference that the Board denied the petition for removal (the Board's only argument on the embroilment point in addition to citations to *Buckley* and *McCann*). The Board has made no showing that the standard for removal in workers' compensation hearings equates to personal embroilment in contempt hearings. ■ In any event, this court is not bound by the Board's decisions on questions of law. (E.g., *Western Electric Co.* v. *Workers' Comp. Appeals Bd.* (1979) 99 Cal.App.3d 629, 644 [160 Cal.Rptr. 436]; *City of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1979) 91 Cal.App.3d 759, 763 [154 Cal.Rptr. 379].)

## CONCLUSION

Due process required Referee Flynn to send the contempt hearing to another judge. She did not; the subsequent judgment of contempt is therefore annulled.

Wallin, J., and Sonenshine, J., concurred.

A petition for a rehearing was denied July 26, 1994.